UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SIGNATURE CONSULTANTS, INC., and JAY L. COHEN, | ) ) ) ) | |
| Plaintiffs, | ) ) | MC-10357-RCL |
| v. | ) ) | |
| STEVEN DROOKER, | ) ) ) | |
| Defendant. | ) ) | |
| STEVEN DROOKER, | ) ) ) | |
| Counter-Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| SIGNATURE CONSULTANTS, INC., and JAY L. COHEN | ) ) ) ) | |
| Counter-Defendants. | ) ) | |

## OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DOCUMENT PRODUCTION BY BEACON HILL STAFFING GROUP, LLC, AND ANDREW WANG

Defendant, Steven Drooker ("Drooker") hereby opposes Plaintiffs/Defendants-in-

Counterclaim Jay L. Cohen ("Cohen") and Signature Consultants, Inc.'s ("Signature, Inc.")

(collectively, "Plaintiffs") Motion to Compel Document Production by Beacon Hill Staffing

Group, LLC ("Beacon Hill"), and Andrew Wang ("Wang") (the "Motion").

The Motion must be denied for the reasons set forth below.

## FACTUAL BACKGROUND

1.    Signature Consultants, LLC ("Signature LLC") is a limited liability company formed by Drooker and Cohen in May of 1997. Specifically, Drooker owns 25% of Signature LLC; Signature, Inc. (a corporation wholly owned by Cohen) owns 50%; and the Drooker 1997 Irrevocable Trust owns the remaining 25%.

2.    Signature LLC is in the business of placing temporary and permanent personnel with business customers, principally in the information technology ("IT") market. Signature LLC also places personnel in the accounting and finance ("A&F") market, but only in Charlotte, North Carolina. Signature LLC generates in excess of $40 million in revenue annually. The IT business accounts for over 95%, while the A&F business accounts for the remaining 5%.

3.    Drooker and Cohen are the co-managers of Signature LLC. Cohen, however, is the sole day-to-day manager of the business.

4.    Drooker and Cohen are former brother-in-laws and long time friends whose personal relationship disintegrated during the course of their business relationship. It was after that friendship broke down that this lawsuit was filed.

5.    In March of 2004, Cohen and Signature, Inc. filed a Complaint against Drooker in the Circuit Court for the 17th Judicial Circuit in and for Broward County, Florida. A true and accurate copy of the Complaint is attached hereto as Exhibit A. Drooker removed the case to the United States District Court for the Southern District of Florida ("Southern District Court").

6.    Two counts of Plaintiffs' Complaint indirectly relate to non-party Beacon Hill. Specifically, Count I of the Complaint alleges that Drooker breached fiduciary duties owed to Cohen and Signature, Inc., individually because Drooker's wife's Boston based company, Beacon Hill (of which Drooker had a 1% ownership interest for a period of time), competes with

2

Signature LLC's A&F business that is located in Charlotte, North Carolina (the "competition claim").

7.    Count II alleges that Drooker breached alleged fiduciary duties owed to Cohen and Signature, Inc. individually with respect to a real estate lease and a services agreement entered into between Signature LLC and entities which Drooker has some interest. The first of these transactions is the lease of real property from the 16 Wheeling Ave. Trust that is wholly irrelevant to Plaintiffs' Motion; the second is an agreement pursuant to which Signature LLC provided Beacon Hill with certain "back-office" administrative services for a monthly fee (the "Services Agreement") initially set at $3,000 per month and eventually increasing to $4,000 per month.

8.    On or about September 9, 2004, Drooker, through counsel, filed a Summary Judgment Motion ("Drooker's Motion") seeking dismissal of Plaintiffs' Complaint. A true and accurate copy of Drooker's Summary Judgment Memorandum is attached hereto as Exhibit B. Drooker's Motion is pending and awaiting a hearing. Among other things, Drooker's Motion argues that the Southern District Court lacks subject matter jurisdiction to decide Counts I and II of Plaintiffs' Complaint, and that Cohen consented to and/or authorized the Services Agreement at issue in Count II . The subject matter jurisdiction arguments are based on the fact that Cohen is not a member of Signature LLC and thus is not owed any fiduciary duties whatsoever as a matter of law. As to Signature, Inc., which is a member of Signature LLC, the Motion is based on the fact that the claims are all derivative in nature and yet are brought as direct claims. Signature LLC is not a party to the underlying action and cannot be joined without destroying diversity jurisdiction. Exhibit B, p. 10.

3

9.    On or about November 11, 2004, Plaintiffs served two Subpoenas Duces Tecum ("Subpoenas"); one on the upon the Keeper of the Records of Beacon Hill, and one on Andy Wang ("Wang"), Beacon Hill's Chief Executive Officer.  A true and accurate copy of the Subpoenas are attached hereto as Exhibit C.

10.    Each Subpoena contained identical document requests entitled "Schedule A." Exhibit C.  Specifically, Schedule A demands 29 separate categories of documents, that, if compelled, would require non-parties Beacon Hill and Wang to search through virtually all of its business records and, in some instances, to produce proprietary and confidential information.

11.    On or about November 23, 2004, Beacon Hill and Wang served a Rule 45(c)(2)(B) Objection (the "Objection") on Plaintiffs which, among other things, objected to the volume and subject matter of certain documents requested in the Subpoenas.  A true and accurate copy of the Objection is attached hereto as Exhibit D.  More specifically, Beacon Hill and Wang objected to, and continue to object to, the Subpoenas on grounds that they seeks in some instances, irrelevant information, and in others, confidential and proprietary information.  Moreover, the requests as a whole are overbroad and burdensome.

12.    Plaintiffs' Motion followed.[1]

## ARGUMENT

### 1.  Plaintiffs Request Irrelevant Documents

The most basic control on discovery is predicated on the rule that parties are only permitted to obtain discovery of non-privileged materials that are **relevant to the claim or defense** of any party.  Fed. R. Civ. P. 26.  The burden to show both relevance and substantial

---

[1] Plaintiffs' Motion alleges that Beacon Hill and Wang have objected to items 7-8, 12, 20-22, and 28 of the Subpoenas. Beacon Hill and Wang did not intend to limit their objections to those specific requests. Those requests were simply examples used by Beacon Hill and Wang to illustrate the unreasonable and harassing nature of Schedule A in its totality.

need for such relevant information in light of Drooker's objection rests on Plaintiffs. <u>Ferko v. Nat'l Assoc. of Stock Car Auto Racing, Inc.</u>, 2003 U.S. Dist. LEXIS 17669, * 5 (D. N.H. Oct. 3, 2003). A party meets its burden of demonstrating relevancy only when it can show that the information sought is reasonably calculated to lead to the discovery of admissible evidence. Fed R. 26(b); <u>Sheehan v. Doyle</u>, 513 F.2d 895, 898 (1st Cir. 1975); <u>Echostar Comm. Corp. v. The News Corp. Ltd.</u>, 180 F.R.D. 391, 395 (D. Col. Jan. 13, 1998).

Plaintiffs' Complaint raises two primary allegations relating to Beacon Hill—that Drooker caused Beacon Hill to compete with Signature LLC and caused Signature LLC to enter into a Services Agreement whereby it provided administrative services to Beacon Hill at below market value. <u>Exhibit A</u>. The majority of Plaintiffs' requests are patently irrelevant to these issues. For example, Plaintiffs request the following:

- Request No. 1: "[a]ny and all documents that refer to, relate to and/or reflect any expense reports submitted by . . .Drooker . . to Connection Group LLC and/or Beacon Hill Staffing Group"; and
- Request No. 2 : "[a]ny and all documents that refer to, relate to and/or reflect any expense reimbursements to Drooker from Beacon Hill".

Not even the most expansive definition of documents "relevant" to either the competition claim or the Services Agreement can include documents relating to expense reports. Unsurprisingly, Plaintiffs' Motion makes no attempt to explain how these arbitrary requests are germane to the issues raised in the Complaint. A true and accurate copy of Plaintiffs' Memorandum of Law in support of their Motion to Compel is attached hereto as <u>Exhibit E</u>. They simply pronounce it as so. Such a pronouncement, however, is insufficient to satisfy Plaintiffs' burden.

Possibly even more unconnected with Plaintiffs' claims are the following four requests:

- Request No. 12: "[a]ny and all documents that refer to, relate to and/or reflect the retention by Beacon Hill of any law firms, attorneys and/or other legal counsel for any matter";

- Request No. 20: "[a]ny and all documents that refer to, relate to and/or reflect the identity of any action in which Beacon Hill has been a defendant";

- Request No. 21: "[a]ny and all documents that refer to, relate to and/or reflect any debt instrument to which Beacon Hill has been a party, and any guaranty of Beacon Hill's obligations thereunder"; and

- Request No. 22: "[a]ny and all documents that refer to, relate to and/or reflect any lease for space occupied by Beacon Hill."

Plaintiffs' attempt to explain the relevance of these requests in the Memorandum of Law (which fails to cite a single case) that accompanies their Motion. With respect to Request No. 7, they assert that "[i]f, in fact, the same attorneys and law firms represented Signature LLC, Drooker, and Drooker's company, Beacon Hill, it is more probable that Drooker acted with a conflict of interest with regard to the . . [Services Agreement]." This purported relevancy makes no sense. Plaintiffs' claim is that Drooker caused "Signature LLC to provide substantial services to Beacon Hill at below-market cost." Exhibit A, ¶ 43. As such, any conflicts relating to Beacon Hill's representation would not relate to any breaches alleged in the Complaint – instead Plaintiffs, by their own admission, appear to be seeking information that would relate to new and different claims. In other words, it appears that Plaintiffs have interposed this harassing request in order to fish for new claims against Drooker, a patently improper reason. see, e.g., Bowman Dairy Co. v. United States, 341 U.S. 214, 221, 95 L. Ed. 879, 71 S. Ct. 675 (1951) (invalidating a wide-ranging document request in subpoena duces tecum because it was not intended to produce evidentiary materials but was merely a fishing expedition).

Although Plaintiffs understandably make no attempt to explain the relevancy of Request No. 20, which requests documents relating to any matters to which non-party Beacon Hill was a

6

defendant, they do attempt to explain Requests Nos. 21 and 22. Specifically, they assert that documents responsive to these requests would show that Drooker had an ownership interest in Beacon Hill. Plaintiffs fail to mention, however, that Drooker has already admitted his ownership interest (and former managerial position) by virtue of his Response to Plaintiffs' Request for Admissions in this matter. A true and accurate copy of Drooker's Admissions are attached hereto as Exhibit F. Specifically, Plaintiffs asked Drooker to admit that he was a manager of Beacon Hill from the years 2000-2003. Drooker admitted that he did in fact serve as a manager during those years, but no longer does. Exhibit F, ¶¶ 11-22. Additionally, Plaintiffs asked Drooker to admit that he had an equity interest in Beacon Hill from 2000-2003. Again, Drooker admitted that he did, although he no longer does. Exhibit F, ¶¶ 23-30. Further, as explained more fully below, Plaintiffs also include requests that specifically seek documents evidencing Drooker's management and ownership of Beacon Hill. In light of those requests, it is unclear why Plaintiffs have substantial need for those documents that may show Drooker's ownership or management interest in a round-a-bout way. Moreover, Plaintiffs have made no effort to dispose of or otherwise secure the information from Drooker who is a party to the litigation.

As alluded to above, Requests 13-19 specifically seek documents evidencing the management and ownership of Beacon Hill. Whereas the only aspect of Beacon Hill's management and ownership relevant to Plaintiffs' claims are those that relate to Drooker, Request No. 19 should suffice. Specifically, Request No. 19 seeks "[a]ny and all documents that refer to, relate to and/or reflect Drooker's ownership interest and/or management role in Beacon Hill, including any documents relating to any change in such interest or role of Drooker." Put

differently, in light of Request No. 19, it is unclear why Plaintiffs' have a substantial need for Requests No. 13-18.

## 2. **Plaintiffs' Requests are Over Burdensome and Harassing in Nature**

Courts are required to balance the needs for discovery against the burdens imposed when parties are ordered to produce documents. Id. The status of a person or entity as a non-party is a factor that weighs against disclosure. Id.; see In re Brand Name Prescription Drugs Antitrust Litigation, 1995 U.S. Dist. LEXIS 7938 (N.D. Ill. Jun. 9, 1995) (denying motion to compel where documents requests were overbroad in scope). Here, Plaintiffs request 29 separate categories of documents from Beacon Hill and Wang, several of which impose undue and unreasonable burdens in a harassing nature. The following provide examples:

- Request No. 24 seeks "[a]ny and all documents that refer to, relate to, and/or reflect telephone calls between Beacon Hill and Drooker, including phone records[2]"; and

- Request No. 25 seeks "[a]ny and all documents that refer to, relate to and/or reflect any communication between Beacon Hill and Drooker".

Plaintiffs make absolutely no attempt to limit the scope of these requests or to relate them to any issues at bar in this case. They attempt to explain the reasonableness of these requests by asserting that the "claim that production of this information would be overly burdensome stands in dramatic conflict with Drooker's sworn testimony that he had little or nothing to do with the management or operation of Beacon Hill." Exhibit E, p. 6. In contrast to this purported defense to Beacon Hill and Wang's objections, as evidenced above, Drooker has admitted he served as a manger of Beacon Hill from 2000-2003. Thus, Plaintiffs' failure to tailor their requests in any manner whatsoever is wholly inappropriate. Moreover, the fact that Drooker's wife is the

---

[2] The timeframe proposed for all requests is January 1, 2000 – to the present.

8

principal owner of Beacon Hill and has been since its formation in the 1997 (a fact well known to Plaintiffs) makes it obvious that the there will be hundreds if not thousands of calls that fall within the literal scope of the requests, but have absolutely no conceivable relevance.

The harassing nature of Plaintiffs' requests are further exemplified by their requests for documents that, if in existence, would be in the possession and control of Cohen himself as managing member of Signature Consultants, LLC ("Signature LLC"). For example, Request No. 27 seeks "[a]ny and all documents that refer to, relate to and/or reflect communications between Beacon Hill and Signature Consultants, LLC. Moreover, the Services Agreement between Signature LLC and Beacon Hill has been in place for nearly four years, and was administered by Plaintiff Cohen in his capacity as manager.

### 3. Plaintiffs Request Confidential and Proprietary Information

Plaintiffs improperly seek documents that constitute confidential and proprietary information. The following provide examples:

- Request No. 6 seeks "[a]ny and all documents that refer to, relate to and/or reflect the organizational structure and employees of Beacon Hill, including but not limited to organizational charts and employee lists"; and

- Request No. 7 seeks "[a]ny and all documents that reflect the identity of clients, potential or actual, of Beacon Hill in the finance and accounting staffing field.

As mentioned above, where a requesting party concedes that documents it seeks constitute confidential commercial information, it must show it must demonstrate "substantial need." Ferko, 2003 U.S. Dist. LEXIS at *5. Here, Plaintiffs have recognized that certain requests seek proprietary information in that they state in their Motion: "[t]o the extent the subpoena duces tecum requests information that may properly be considered 'proprietary,' Plaintiffs have no objection to entering into a normal confidentiality agreement." Exhibit E, pp. 2-3. Plaintiffs fail

9

however, as required by law, to demonstrate their "substantial need" for the confidential information. Further, Plaintiffs need not know the names of Beacon Hill's clients in light of the fact that Drooker as already admitted that Beacon Hill engages in the placement of accounting and finance personnel, and has done so since mid-2003. Exhibit F, ¶¶ 75-78. Even the most generous reading of Plaintiffs' dubious claims cannot make the identity of a non-party's client bare relevance. Accordingly, Plaintiffs' request for confidential and proprietary documents should be denied.

## CONCLUSION

When a court is asked to rule on the propriety of discovery in a case over which it is not presiding, it presents a challenge. What Beacon Hill and Wang ask this Court is to recognize that they are non-parties; the underlying suit presents dubious claims that, among other things, are subject to a pending summary judgment motion; and that the requests on their face are boundless and ridiculous. Plaintiffs' Subpoenas represent nothing more than a fishing expedition, served to harass and unduly burden non-parties to this lawsuit. The challenged requests have been properly objected to in that they are burdensome and seek irrelevant and proprietary information. For these reasons, Plaintiffs' motion must be denied and Wang and Beacon Hill should be awarded their costs and attorneys fees incurred in submitting this opposition.

ANDY WANG AND BEACON HILL
STAFFING GROUP, LLC
By their attorneys,

*Erika M Holmes*

James W. Stoll (BBO#544136)
Erika M. Holmes (BBO#657243)
BROWN RUDNICK BERLACK ISRAELS
One Financial Center
Boston, MA 02111
(617) 856-8200

December 21, 2004

### CERTIFICATE OF SERVICE

I hereby certify that *Drooker's Opposition to Plaintiffs' Motion to Compel Document Production By Beacon Hill Staffing Group, LLC, and Andy Wang* was sent via first class mail to Nicholas J. Walsh, 600 Atlantic Avenue, Boston, Massachusetts 02210 and Larry A. Stumpf, Black Srebnick Kornspan & Stumpf, 201 S. Biscayne Boulevard, Suite 1300 Miami, Florida 33131.

*Erika M Holmes*

Erika M. Holmes

#1318395 v\1 - holmesem - s9@301!.doc ⌐ - 18009/6

IN THE CIRCUIT COURT FOR THE
17TH JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION

CASE NO.    04004515

SIGNATURE CONSULTANTS, INC.
and JAY L. COHEN,

      Plaintiffs,

v.

STEVEN DROOKER,

      Defendant.

_____/

*A TRUE COPY*
*HOWARD C. FORMAN*
*CLERK OF CIRCUIT COURT*
*MAR 16 2004*

## COMPLAINT

    Plaintiffs, Signature Consultants, Inc. and Jay L. Cohen ("Cohen"), by and through

undersigned counsel, file this complaint against Defendant Steven Drooker ("Drooker") and

allege as follows:

### NATURE OF CASE

    1. This is a civil action by Jay L. Cohen and the corporation wholly owned and controlled

by him, Signature Consultants, Inc. ("Signature-Cohen"), seeking to recover the losses sustained

by Plaintiffs, as, respectively, a member of and a manager of Signature Consultants, L.L.C.

("Signature LLC"). Signature-Cohen and Cohen have sustained substantial losses by reason of

the breaches by Drooker, the other manager of Signature LLC, of his duties of loyalty and other

duties  owed to Signature-Cohen with respect to the conduct of the business of Signature LLC.

As detailed below, Drooker is competing with Signature LLC in a core area of Signature LLC's

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone: 305-371-6421 • Fax: 305-371-6322 • www.RoyBlack.com

*Cohen v. Drooker*
Case No. _____

business, has engaged in intentional misconduct, and has engaged in acts that constitute conflicts of interest, all to the detriment of Signature-Cohen and Cohen.

2. In addition, in early 2003 Cohen and Drooker reached a binding verbal agreement on the terms of the formation, governance and operation of a related business, Netis Health Care Staffing, LLC ("Netis"), but Drooker has refused to sign an Operating Agreement with respect to Netis to memorialize the agreed upon terms and has refused to, as agreed, contribute his share of the capital needs of Netis.

3. The claims of Signature-Cohen and Cohen arise under F.S. Chapters 86 (declaratory judgment) and 608 (Limited Liability Companies) and under common law.

## THE PARTIES

4. Cohen is a resident of Palm Beach County and is a manager of Signature LLC. Cohen is the sole shareholder and officer of Signature-Cohen, which is a member of Signature LLC, and owns 50% of the ownership interest in Signature LLC.

5. Drooker is a resident of Needham, Massachusetts and is a manager of Signature LLC. Drooker owns 25% of the ownership interest in Signature LLC; the Drooker 1997 Irrevocable Trust owns 25% of the ownership interest in Signature LLC. Drooker regularly engages in business in Florida, through Signature LLC and otherwise.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction of this action pursuant to F.S. 608.461 and otherwise.

7. The acts that form the basis for this Complaint occurred in substantial part in Broward County, Florida. Venue is proper in this Court pursuant to F.S. Chapter 47 and otherwise.

-2-

*Cohen v. Drooker*
Case No. _____

8. All conditions precedent to the prosecution of these claims have been performed, have occurred, or have been waived or excused.

## FACTUAL BACKGROUND

9. Signature LLC was formed in May, 1997 and is in the business of short-term and permanent placement of personnel, primarily in the information technology and finance and accounting ("F&A") fields.

10. The corporate governance of Signature LLC is controlled by F.S. Chapter 608 and the Operating Agreement of Signature LLC, dated May 16, 1997 and captioned "Regulations." A copy of the "Operating Agreement" of Signature LLC is attached hereto as Exhibit "A" and incorporated herein by reference.

11. The principal office of Signature LLC is located in Fort Lauderdale. Signature LLC also has offices in Orlando; Charlotte; Woburn, Massachusetts; and Reston, Virginia.

12. Pursuant to Article V of the Operating Agreement, Cohen and Drooker are managers of Signature LLC, with full authority to manage Signature LLC.

13. Both Cohen and Drooker (sometimes through their respective entities) loaned to Signature LLC substantial sums of start-up capital, all of which has now been repaid by Signature LLC.

### Beacon Hill Competes with Signature LLC

14. In or about early 2000, Signature LLC determined that a key component of its overall business plan for its continued growth and profitability would be to expand into the field of short-term and permanent personnel placement in the F&A field. Accordingly, Signature LLC formed its F&A division in December, 2000. Signature LLC hired Keith Kaplan to head its F&A division and placed Kaplan in its Charlotte office.

-3-

15. In or about early 2002, during a decline in the information technology placement market, Signature LLC, with the full support of Drooker, embarked on a strategy to further expand its F&A division.

16. Drooker not only fully supported the Signature LLC strategy of expanding its F&A division, but also told Cohen and others within Signature LLC that, because of Drooker's prior experience and capabilities in the F&A placement market, Signature LLC's F&A division should be headquartered in the Woburn, Massachusetts office and be under his direct supervision.

17. To the detriment of Signature LLC and during the exact same time period that Signature LLC, with Drooker's apparent support and encouragement, was attempting to significantly expand its business in the F&A field, Drooker was, in fact, causing a company in which he holds an interest, of which his wife is, upon information and belief, the majority owner, and of which Drooker is the sole manager (Beacon Hill Staffing Group, LLC, "Beacon Hill"), to actively compete with Signature LLC in the F&A personnel placement field.

18. After substantial efforts by Signature LLC to hire a strongly recommended and highly qualified candidate to head the Signature LLC F&A division in the Woburn office, Drooker insisted, in mid-2002, that Signature LLC not hire the subject candidate.

19. Likewise, Drooker refused to allow Signature LLC to hire other qualified candidates to head Signature LLC's F&A division in Woburn.

20. Upon information and belief, Drooker arranged for at least one candidate that had been interviewed by Signature LLC for the F&A position in Woburn to be hired by Beacon Hill Staffing Group, LLC, a business described below that competes directly with Signature LLC and in which Drooker has a substantial interest.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 · Miami, Florida 33131 · Phone: 305-371-6421 · Fax: 305-371-6322 · www.RoyBlack.com

21. In mid to late 2003, Drooker caused Beacon Hill Staffing Group, LLC to hire yet another person that had been a strong candidate for Signature LLC's F&A division in Woburn.

22. Since its inception, and in spite of Drooker's clandestine efforts to sabotage it, Signature LLC's F&A division has generated revenues well in excess of $1,000,000.

23. In furtherance of his improper and unlawful actions to cause Beacon Hill to directly compete with Signature LLC, Drooker, among other things:

    a. caused Beacon Hill to hire, in mid 2002, Andrew Wang (who had previously worked for Drooker at a company owned in substantial part by Drooker) to head Beacon Hill's efforts in the F&A placement field;

    b. caused Beacon Hill to hire, in mid 2003, a number of F&A placement employees;

    c. actively concealed Beacon Hill's activities from Cohen and others at Signature LLC; and

    d. attempted to arrange for Beacon Hill to hire Signature LLC's controller, Layne Tharp.

**Other Conflicts**

24. In addition, in April, 2001 Drooker caused Signature LLC to enter into a contract with Beacon Hill, pursuant to which Signature LLC agreed to do all of the data processing, payroll and other "back-office" functions of Beacon Hill, for an amount to be paid by Beacon Hill to Signature LLC that was, and is, far below the fair market value of the services performed by Signature LLC for Beacon Hill. The agreement between Beacon Hill and Signature LLC was not properly disclosed to, or authorized by, Signature LLC. Instead, Drooker assured Cohen and Signature LLC that Beacon Hill was a small secretarial placement service run by his wife 'to give her something to do.' Since April 2001, Signature LLC has performed these services for

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone: 305-371-6421 • Fax: 305-371-6322 • www.RoyBlack.com

Beacon Hill on terms, which were arranged by Drooker, resulting in substantial losses to Signature LLC and a substantial windfall to Beacon Hill and Drooker.

25. Moreover, in or about early 2001, Drooker caused Signature LLC to enter into a lease with Wheeling Avenue Realty Trust for office space in the Boston area for Signature LLC. Drooker has, upon information and belief, a substantial financial interest in Wheeling Avenue Realty Trust. The amount of space leased by Signature LLC is far in excess of the actual needs of Signature LLC, and the terms of the lease are unfavorable to Signature LLC, resulting in losses to Signature LLC and improper benefits to Drooker. The subject lease was not properly disclosed to, or authorized by, Signature LLC.

26. The material negative impacts of Drooker's improper and unlawful actions described herein upon Signature LLC and Cohen extend far beyond the monetary losses caused thereby; Drooker's actions literally resulted in a risk to the continued viability of Signature LLC.

**Impact on Key Employees of Signature LLC**

27. At the time that Signature LLC was formed (May 1997), Drooker insisted that, in order to recruit, retain and provide incentive to key employees, Signature LLC grant to such key employees a "stake" in the long-term financial success (and equity value) of Signature, LLC.

28. Accordingly, a significant portion of the benefit package provided by Signature LLC to its key employees has always been the right of these employees, upon the sale or going public of Signature LLC, to receive a portion of the amount received by Signature LLC upon such sale or going public. These rights ("Phantom Stock") have been granted by Signature LLC to its key employees in written employment agreements.

29. The key employees of Signature LLC who hold such Phantom Stock are aware of the improper and unlawful actions (and failures to act) of Drooker set forth herein, and are equally

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone: 305-371-6421 • Fax: 305-371-6322 • www.RoyBlack.com

aware that these actions of Drooker have substantially reduced, and continue to further substantially reduce, the profitability and equity value of Signature LLC, and hence the value their Phantom Stock. As a result, Drooker's improper and unlawful actions have jeopardized, and continue to jeopardize, the ability of Signature LLC to retain its key employees. Several of the key employees of Signature LLC have advised Cohen that they are considering leaving Signature LLC specifically because of Drooker's actions (and inactions), resulting in significant damages to Signature-Cohen and Cohen, and putting at risk the on-going viability of Signature LLC.

30. In early 2003, Cohen and Drooker reached a binding verbal agreement regarding the formation, governance and operation of a company to be known as Netis Health Care Staffing, LLC ("Netis"). The business of Netis was to be the placement of healthcare personnel. In essence, Cohen and Drooker agreed that Cohen and Drooker would equally capitalize and each own 40% of equity interest in Netis (with the remaining 20% of the equity held by key employees of Signature LLC, as described below), that Cohen would be the sole manager of Netis, and that Drooker would be consulted on major decisions.

31. Despite the fact that Cohen and Drooker reached a binding verbal agreement regarding the formation, governance and operation of Netis, Drooker has refused to sign an Operating Agreement for Netis reflecting the agreed upon terms and has refused to contribute his agreed upon share of the capital required by Netis.

32. A material term of the binding verbal agreement reached between Cohen and Drooker regarding Netis was that certain key employees of Signature LLC (who would also work for Netis) would, as a group, receive a 20% equity ownership in Netis.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 · Miami, Florida 33131 · Phone: 305-371-6421 · Fax: 305-371-6322 · www.RoyBlack.com

33. Drooker's improper and unjustified refusal to sign an Operating Agreement for Netis reflecting the agreed upon terms and providing for the agreed upon 20% equity ownership for certain key employees of Signature LLC has damaged Cohen and Signature-Cohen in at least the ways described below.

34. The key employees of Signature LLC are aware that Drooker's improper refusal to sign an Operating Agreement for Netis, reflecting the terms thereof agreed upon by Cohen and Drooker, has caused them not to receive the equity ownership position in Netis that they were promised. Accordingly, the key employees of Signature LLC have advised Cohen that, as a direct result of Drooker's improper actions and inactions, they are considering leaving Signature LLC and Netis. Of course, the departure from Signature LLC and Netis of these key employees would cause grave damage to Signature-Cohen and Cohen. The actions and inactions of Drooker have damaged Signature-Cohen and Cohen by demoralizing and diminishing the incentive of the key employees of Signature LLC and Netis.

35. Moreover, Drooker's failure to sign an Operating Agreement for Netis has caused monetary damage to Cohen by impeding the successful start-up and operation of Netis.

## COUNT 1
### (Breach of Duty of Loyalty)

36. Plaintiffs repeat and reallege each allegation in paragraphs 1 through 35 above.

37. Pursuant to F.S. 608.4225(1)(a), the Management Agreement, and otherwise, Drooker owed, and owes, a duty of loyalty to Signature-Cohen with respect to Signature LLC.

38. Drooker has breached, and continues to breach, the duty of loyalty owed by Drooker to Signature-Cohen by, among other things, causing Beacon Hill to directly compete with Signature LLC, in conscious disregard of the best interests of, and to the detriment and damage of, Signature-Cohen and Cohen.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 · Miami, Florida 33131 · Phone: 305-371-6421 · Fax: 305-371-6322 · www.RoyBlack.com

39. Drooker received an improper personal benefit, either directly or indirectly, by causing Beacon Hill, a company in which he holds an interest, to compete with Signature LLC.

40. As a result, Signature-Cohen and Cohen have sustained damages in an amount to be determined at trial, and presently believed to be in excess of $1,000,000, exclusive of interest and costs.

## COUNT 2
### (Conflict of Interest – Breach of Obligation of Good Faith and Fair Dealing)

41. Plaintiffs repeat and reallege each allegation in paragraphs 1 through 35 above.

42. Pursuant to F.S. 608.4225, the Management Agreement, and otherwise, Drooker owed, and owes, to Signature-Cohen the duty to refrain from acting in a manner that either creates a conflict of interest and/or breaches his obligation of good faith and fair dealing with respect to Signature LLC.

43. Drooker has breached, and continues to breach, his obligations to Signature-Cohen to refrain from conflicts of interest with respect to Signature LLC, by causing Signature LLC to provide substantial services to Beacon Hill at below-market cost, by causing Signature LLC to sign the lease with Wheeling Avenue Realty Trust, and otherwise, in conscious disregard of the best interests of, and to the detriment of, Signature LLC.

44. Drooker derived an improper personal benefit from these transactions, either directly or indirectly.

45. As a result, Signature-Cohen and Cohen have sustained damages in an amount to be determined at trial, and presently believed to be in excess of $250,000, exclusive of interest and costs.

Black. Srebnick. Kornspan & Stumpf
201 S. Biscayne Boulevard. Suite 1300 · Miami, Florida 33131 · Phone: 305-371-6421 · Fax: 305-371-6322 · www.RoyBlack.com

## COUNT 3
### (Declaratory Judgment – Netis)

46. Plaintiffs repeat and reallege each allegation in paragraphs 1 through 37 above.

47. Pursuant to F.S.608.423, and otherwise, an operating agreement regarding the formation, governance and operation of a limited liability company need not be in writing.

48. Cohen and Drooker reached a binding verbal agreement regarding the formation, governance and operation of Netis.

49. On or about January 10, 2003, Cohen, by counsel, sent to Drooker, by counsel, a written Operating Agreement for Netis setting forth the terms of the verbal agreement reached by Cohen and Drooker.

50. Drooker has refused to sign an operating agreement regarding Netis setting forth the agreed upon terms.

51. A bona fide controversy, ripe for determination by this Court, exists between Cohen and Drooker with respect to the Operating Agreement for Netis.

52. Cohen believes that the written Operating Agreement sent by Cohen to Drooker in January 2003, incorporates the terms agreed upon between Cohen and Drooker regarding Netis.

53. Upon information and belief, Drooker's position is that the written Operating Agreement for Netis described in paragraph 49 above does not reflect the terms of the verbal agreement regarding Netis reached by Cohen and Drooker.

WHEREFORE, Cohen seeks a declaratory judgment that the written Operating Agreement described in paragraph 49 above reflects the terms of the verbal agreement reached between Cohen and Drooker regarding Netis and that Cohen and Drooker are bound by the terms of the

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 · Miami, Florida 33131 · Phone: 305-371-6421 · Fax: 305-371-6322 · www.RoyBlack.com

*Cohen v. Drooker*
Case No. _____

subject written operating Agreement, appropriate relief in connection with such declaratory

judgment, and such other relief as the Court deems just and proper..

Dated: March 16, 2004

Respectfully Submitted,

Black, Srebnick, Kornspan & Stumpf, P.A.
*Attorneys for Plaintiffs Signature Consultants, Inc.
and Jay L. Cohen*
201 S. Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Tel: (305) 371-6421
Fax: (305) 371-6322

By _____
     Larry A. Stumpf, Esq.
     Florida Bar No. 280526

# Exhibit A

REGULATIONS OF
SIGNATURE CONSULTANTS, L.L.C., A LIMITED LIABILITY COMPANY

THESE REGULATIONS are made effective by the undersigned, whose signatures appear on the signature page hereof, as of this 16th day of May, 1997.

## ARTICLE I
## DEFINITIONS

The following terms used in these Regulations shall have the following meanings (unless otherwise expressly provided herein);

(a)    "Articles of Organization" shall mean the Articles of Organization of SIGNATURE CONSULTANTS, L.L.C., as filed with the Florida Department of State, as the same may be amended from time to time.

(b)    "Assignee" shall mean the owner of an Economic Interest who is not a Member.

(c)    "Florida Act" shall mean the Florida Limited Liability Company Act, Florida Statues Chapter 608, et seq., as amended.

(d)    "Company" shall refer to Signature Consultants, L.L.C.

(e)    "Distributable Cash" means all cash, revenues and funds received by the Company, less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred incident to the normal operation of the Company's business; and (iii) such reserves as the Members deem reasonably necessary to the proper operation of the Company's business.

(f)    "Economic Interest" shall mean a Member's or Assignee's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to these Regulations and the Florida Act, but shall not include any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members.

(g)    "Majority Interest" shall mean one or more interests of Members in net profits as set forth in Section 9.1, which taken together exceed 50% of the aggregate of all such interests in net profits.

(h)    "Member" shall mean each of the parties who executes a counterpart of these Regulations as a Member and each of the parties who may hereafter become Members. If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.

(i)    "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and such other rights and privileges that the Member may enjoy by being a Member (including such Member's Voting Rights, if any, unless otherwise specified herein).

(j)    "Person" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

(k)    "Regulations" shall mean these Regulations as originally executed and as amended from time to time.

(l)    "Treasury Regulations" or "Treas. Reg." shall mean the Income Tax Regulations promulgated by the Secretary of the Treasury.

(m)    "Voting Rights" shall mean the right to vote on decisions of the Members.

## ARTICLE II
## FORMATION OF COMPANY

2.1    Formation.  On May 16, 1997, Signature Consultants, Inc. organized a Florida Limited Liability Company by executing and delivering Articles of Organization to the Florida Department of State in accordance with and pursuant to the Florida Act.

2.2    Name.  The name of the Company is Signature Consultants, L.L.C.

2.3    Principal Place of Business.  The principal place of business of the Company within the State of Florida shall be Avion Corporate Center, 2200 West Commercial Boulevard, Suite 207, Ft. Lauderdale, Florida 33309.  The Company may locate its places of business and registered office at any other place or places as the Managing Member may from time to time deem advisable.

2.4    Registered Office and Registered Agent.  The Company's initial registered office shall be at the office of its registered agent at 11780 U.S. Highway One, Suite 300, North Palm Beach, Florida 33408, and the name of its initial registered agent at such address shall be FHS Corporate Services, Inc., a Florida corporation.  The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Florida Department of State pursuant to the Florida Act.

2.5    Term.  The term of the Company shall be thirty (30) years from the date of filing of Articles of Organization with the Florida Department of State, unless the Company is earlier dissolved in accordance with either the provisions of these Regulations or the Florida Act.

## ARTICLE III
## BUSINESS OF COMPANY

3.1   <u>Permitted Businesses</u>.  The business of the Company shall be:

(a)   To accomplish any lawful business whatsoever, or which shall at any time appear conducive to or expedient for the protection or benefit of the Company and its assets.

(b)   To exercise all other powers necessary to or reasonably connected with the Company's business which may be legally exercised by limited liability companies under the Florida Act.

(c)   To engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

## ARTICLE IV
## MEMBERSHIP

Membership Interests in the Company shall be divided among the initial Members as set forth in Exhibit 4(a).  In addition, the initial Members shall have Voting Rights in the percentages set forth in Exhibit 4(b).

The names and addresses of the initial Members are as follows:

| NAME | ADDRESS |
|---|---|
| Signature Consultants, Inc. | Avion Corporate Center<br>2200 West Commercial Boulevard<br>Suite 207<br>Ft. Lauderdale, Florida  33309 |
| Steven Drooker | 303 Greenwood Street<br>Newton, Massachusetts  02159 |
| Drooker 1997<br>Irrevocable Trust | 303 Greenwood Street<br>Newton, Massachusetts  02159 |

-3-

## ARTICLE V
## RIGHTS AND DUTIES OF MANAGING MEMBERS

5.1    Management Authority.

Jay L. Cohen and Steven Drooker are hereby appointed Managers of the Company. The Managers shall be responsible for management of the day-to-day business of the Company and for carrying out the decisions of the Members. The Managers shall have full, exclusive and complete authority and discretion in the management of the Company's business and shall have full power and authority to take all actions and execute all instruments or other documents necessary or appropriate to the conduct of such business. The Managers may resign as such at any time, after giving not less than 30 days' notice to all other Members.

Without limiting the foregoing, the Managers shall have full power and authority, for and on behalf of the Company:

(a)    to purchase, lease or otherwise acquire, improve, develop, manage, maintain and operate such real or personal property as may reasonably be necessary or incidental to the Company's business;

(b)    to sell, lease, exchange or otherwise dispose of all or any portion of the property of the Company in the ordinary course of the Company's business;

(c)    to borrow money on a secured or unsecured basis to finance the operations of the Company; to encumber all or any portion of the Company's property to secure such borrowing; and to repay, refinance, increase, modify, consolidate or otherwise deal in such borrowings and encumbrances;

(d)    to cause the Company to enter into and form other companies, ventures or entities in furtherance of its purposes;

(e)    to prosecute, defend, settle or compromise claims, and satisfy judgments, by or against the Company, and otherwise protect the Company's interests;

(f)    to expend Company funds in connection with Company business and in furtherance of Company purposes;

(g)    to invest excess Company funds;

(h)    to obtain and maintain such casualty, liability, indemnification, fidelity, business interruption and other insurance as the Managing Member deems necessary or appropriate, including insurance to protect the Members from liability for acts or omissions in connection with the Company's business and affairs; and

(i)     to engage or retain such employees, agents, independent contractors, attorneys and accountants as the Managing Member deems necessary or appropriate in furtherance of the Company's business, and to determine the terms of such engagements or retentions.

5.2     Conflicts of Interest.  The Members shall not be prohibited from or otherwise limited in employing, contracting with (including, but not limited to, contracts for the sale, exchange, or lease of the Company's property otherwise permitted under these Regulations), or otherwise dealing with, any Person by reason of the fact that such Person is a Member or an affiliate of any Member, or is an entity in which any Member has an interest, whether such relationship, affiliation, or interest is direct or indirect, provided that the fact of such relationship or affiliation is known or disclosed to all Members and the terms and conditions, including the price, of such employment, contract or other dealing are fair and reasonable and in the best interests of the Company.

## ARTICLE VI
## RIGHTS AND OBLIGATIONS OF MEMBERS

6.1     Limitation of Liability.  Each Member's and Assignee's liability shall be limited as set forth in these Regulations, the Florida Act and other applicable law.

6.2     Company Debt Liability.  Neither a Member nor an Assignee will be personally liable for any debts or losses of the Company beyond his respective capital contributions and any obligation of the Member under Section 8.1 to make capital contributions, except as otherwise required by law.

## ARTICLE VII
## MEETINGS AND ACTS OF MEMBERS

7.1     Meetings.  The Members may meet at such times and places, either within or outside the State of Florida, as may be determined by the Members holding a Majority Interest. The Members shall have no obligation to conduct annual meetings or to keep minutes thereof.

7.2     Manner of Acting.  The vote, consent or agreement of Members holding a majority of the Voting Rights shall be the act of the Members, unless the vote, consent or agreement of a greater or lesser proportion or number is otherwise required by the Florida Act or by these Regulations.

7.3     Proxies.  At any meetings of Members, a Member holding Voting Rights and authorized to vote may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact.  Such proxy shall be filed with the Company before or at the time of the meeting.  No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

## ARTICLE VIII
## CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

8.1    Members' Capital Contributions. Each Member or Assignee shall contribute such amount as is set forth in Exhibit 8.1 hereto as his or her share of the initial capital contribution.

8.2    Additional Contributions. Except as set forth in Section 8.1, no Member or Assignee shall be required to make any capital contributions. To the extent determined by the Managing Member, the Members and Assignees may be permitted to make additional capital contributions if and to the extent they determine that such additional capital contributions are necessary or appropriate.

8.3    Capital and Capital Accounts.

(a)    Definition of Capital Account. A capital account shall be maintained on the books of the Company for each Member. The capital account of a Member as of any date shall equal the amount of the Member's paid-in Capital Contributions recorded on the books of the Company, increased by (i) any cash contributions made by such Member, (ii) the Gross Asset Value (as defined in subparagraph (b) herein) of any asset contributed by such Member to the Company (as determined immediately prior to such contribution), (iii) the Member's distributive share of Company profits and income (including tax exempt income), (iv) the Member's share of any increase in the basis of Company assets pursuant to Section 50(c) of the Internal Revenue Code of 1986, as amended (the "Code"), and (v) the amount of any Company liabilities that are assumed by such Member or that are secured by any Company properties distributed to such Member; and decreased by (i) such Member's distributive share of Company losses and deductions, (ii) cash distributed by the Company to such Member, (iii) the Gross Asset Value of any Company property distributed to such Member (as determined immediately prior to such distribution), (iv) the amount of any liabilities of such Member that are assumed by the Company or are secured by any properties contributed by such Member to the Company, (v) the Member's share of expenditures of the Company not deductible in computing its taxable income (such as syndication expenses, if any) and (vi) the Member's share of reductions in the basis of Company assets not otherwise taken into account (such as the reduction in basis provided by Section 50(c) of the Code). The capital accounts of all Members shall also be increased or decreased immediately prior to any Adjustment Date (as defined in subparagraph (c)) to reflect the aggregate net increase or decrease in Gross Asset Value made pursuant to subparagraph (b)(ii) as if the upward or downward change in the Gross Asset Value arising from such adjustment had been income or loss, respectively, and allocated among the Members pursuant to Section 9.1.

For the purpose of computing the amount of income and deductions to be reflected in a capital account, tax-exempt income shall be computed as though it were taxable, and expenditures which are not deductible or capitalized shall be computed as if they were deductible and these amounts shall be allocated pursuant to Section 9.1 as if they were profits or losses.

(b)    <u>Gross Asset Value</u>. For purposes of determining and maintaining the Members' capital accounts, the term "Gross Asset Value" means, with respect to any asset, the adjusted basis of the asset for federal income tax purposes as follows:

(i)    The initial Gross Asset Value of any asset contributed to the Company by a Member shall be the gross fair market value of such asset, as determined by the Company and the Member or Members making such contribution;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Company as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a <u>de minimis</u> Capital Contribution; (b) upon liquidation of the Company, or upon the distribution by the Company to a Member of more than a <u>de minimis</u> amount of money or other Company property to a retiring or continuing Member as consideration for an interest in the Company; or (c) under generally accepted industry accounting practices, provided that substantially all of the Company's property (excluding money) consists of stock, securities, commodities, options, warrants, futures, or similar instruments that are readily tradable on an established securities market; and

(iii)    If the Gross Asset Value of an asset has been determined or adjusted pursuant to subsections (i) or (ii) of this Section 8.3(b), such Gross Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing book profits and losses.

(c)    <u>Adjustment Date</u>. The term "Adjustment Date" means the date on which any of the following occurs: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a <u>de minimis</u> Capital Contribution; (b) the distribution by the Company to a Member of more than a <u>de minimis</u> amount of Company property; or (c) the termination of the Company for federal income tax purposes pursuant to Section 708(b)(1)(b) of the Code. Upon the distribution by the Company of any assets in-kind to any Member other than in consideration of an interest in the Company, only the Gross Asset Value of the assets actually distributed shall be adjusted.

(d)    <u>Loans</u>. Loans to the Company by any Member shall not be considered Capital Contributions.

(e)    <u>Deficit Restoration</u>. No Member or Assignee shall be required to restore his or her deficit capital account except as may be required by law.

(f)    <u>Capital</u>. The capital of the Company shall consist of the assets with the valuation thereof specified on Exhibit 8.3 entitled "Contributions to Capital and Assets of Company," attached hereto and incorporated herein. All property originally paid or brought into, or transferred to the Company as Capital Contributions of the Members, or subsequently acquired by purchase or otherwise on account of the Company, is property of the Company. The title to all of the Company's property shall be held in the name of the Company.

The foregoing provisions and the other provisions hereof relating to the maintenance of capital accounts are intended to comply with the Treas. Reg. § 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulation.

## ARTICLE IX
## ALLOCATIONS, INCOME TAX DISTRIBUTIONS, ELECTIONS AND REPORTS

9.1     Allocation of Profits, Losses, Credits and Other Items.

(a)     Allocation of Profits and Losses. All items of Company income, gain, loss and deduction as determined for book purposes shall be allocated among the Members and credited or debited to their respective Capital Accounts in accordance with Treas. Reg. § 1.704-1(b)(2)(iv), so as to ensure to the maximum extent possible (i) that such allocations satisfy the economic effect equivalence test of Treas. Reg. § 1.704-1(b)(2)(ii)(i) (as provided hereinafter) and (ii) that all allocations of items that cannot have economic effect (including credits and nonrecourse deductions) are allocated to the Members in proportion to their Membership Interests unless required by Code section 704(b) and the Treasury Regulations promulgated thereunder. Subject to paragraph (b) of this Section 9.1, to the extent possible, items that can have economic effect shall be allocated in such a manner that the balance of each Member's Capital Account at the end of any taxable year (increased by such Member's "share of partnership minimum gain" as defined in Treas. Reg. § 1.704-2) would be positive to the extent of the amount of cash that such Member would receive (or would be negative to the extent of the amount of cash that such Member should be required to contribute to the Company) if the Company sold all of its property for an amount of cash equal to the book value (as determined pursuant to Treas. Reg. § 1.704.1(b)(2)(iv)) of such property (reduced, but not below zero, by the amount of nonrecourse debt to which such property is subject) and all of the cash of the Company remaining after payment of all liabilities (other than nonrecourse liabilities) of the Company were distributed in liquidation immediately following the end of such taxable year in accordance with Section 11.2.

(b)     Other Tax Items. All Nonrecourse Deductions as defined in Treas. Reg. § 1.704-2(c) or Partner Nonrecourse Deductions as defined in Treas. Reg. § 1.704-2(i)(2) shall be allocated to Steven Drooker. All other tax items of the Company shall be allocated among the Members as provided in the Code and Treasury Regulations for a partnership.

(c)     Qualified Income Offset. In the event that (i) distributions are made to Members or (ii) the Company repays or otherwise reduces its nonrecourse indebtedness, if any, and, as a result, a Member has (or has increased) a deficit balance in a capital account as of the end of the year (such capital account balances to be adjusted) items of Company income or gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate the deficit balance in the Member's capital account created by such distributions as quickly as possible. Any modification of the manner in which allocation is made requires consent of Members holding at least fifty-one (51%) of the Voting Rights.

(d)    Section 704 Adjustments. Notwithstanding any provision of this Agreement to the contrary, in accordance with Section 704(c) of the Code, income, gain, loss and deduction with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property and its initial Gross Asset Value.

(e)    Minimum Gain Chargeback. Notwithstanding any provision of this Agreement to the contrary, if there is a net decrease in Company "minimum gain" during a taxable year, as that term is defined in such provisions of the Treasury Regulations or applicable tax law that may apply to the allocation of tax benefits among partners, then all Members with deficits in their Capital Accounts (as computed in the manner provided in that part of the Treasury Regulations relating to the minimum gain chargeback rules) shall be allocated items of income and gain for such taxable year (and, if necessary, subsequent years) in the amounts and in the proportions required to eliminate such deficits as quickly as possible.

(f)    Allocation of Recapture Income. Recapture income (under Sections 1245 and/or 1250 of the Code), if any, from the disposition of any Company asset shall be allocated among the Members as provided in the Treasury Regulations.

(g)    Proration in the Event of a Transfer. If any interest in the Company is transferred during a single year, then each item of Company income, gain, loss, deduction, or credit attributable to the transferred Company interest shall be prorated between the transferor and transferee for Federal income tax purposes as required or permitted by the Code or Treasury Regulations, using any convention or method permitted by the Code or Treasury Regulations in making such proration as may be appropriate; provided, however, extraordinary gain or loss (if any) shall be allocated to the holder of the Company interest on the date of the disposition giving rise to the extraordinary gain or loss.

(h)    Allocations upon Admissions or Redemptions. If the percentage interest of a Member is changed during a taxable year for any reason other than the transfer of all or a portion of the Member's interest, then such Member's share of each item of Company income, gain, loss, deduction, or credit shall be determined for Federal income tax purposes by taking into account each such Member's varying percentage interests in the Company and using any convention or method permitted by the Code or the Treasury Regulations.

9.2    Distributions.

(a)    Distribution Other Than in Liquidation. Company distributions, other than from refinancing, sale of the Company's property not in the ordinary course of business, or in liquidation shall be distributed in the ratio of the Membership Interests as set forth in Exhibit 4(a) and in such amounts and at such times as the Managers consider appropriate. In this regard, the Managers may take into account such matters as the repayment of obligations to creditors (including creditors who are also Members) and the setting aside of amounts to be retained by the Company for any purpose, including the conduct of the Company's business affairs. After taking into account the foregoing, the Managers shall endeavor to distribute to the Members an amount that is at least equal to the Managers' estimate of the tax liability attributable to the profits

paid and such amounts shall be also treated as an advance distribution and be subject to repayment.

## ARTICLE X
## TRANSFERABILITY

10.1    Restriction on Transfer. Except to the extent and in the manner specifically provided for herein, no Member shall have the right to sell, assign, transfer, pledge, exchange or otherwise dispose of any or all of its Membership Interest. Each Member hereby acknowledges the reasonableness of the restrictions on transfer of Membership Interests imposed by these Regulations in view of the Company purposes and the relationship of the Members. Accordingly, the restrictions on transfer contained herein shall be specifically enforceable.

10.2    Exception for Authorized Transferees. The restriction provided in Section 10.1 of these Regulations shall not apply to transfers of Membership Interest to the following persons (hereinafter "Authorized Transferees"):

(a)    another Member holding a Membership Interest;

(b)    trusts for the sole benefit of the Member or the Member's spouse, any of the Member's children or their issue or the Member's siblings, nieces and nephews; or

(c)    if the Membership Interest to be transferred does not include Voting Rights (or specifically excludes Voting Rights from such transfer), the Member's spouse, any of the Member's children or their issue or the Member's siblings, nieces and nephews, provided that:

(i)    upon the death or termination of all or any portion of the interest of any beneficiary of the trust, the trust provides that either the Membership Interest of the Company is distributed to one or more of the persons specified in (b) above or is held in such trust in substantially separate and independent shares for the benefit of one or more of the persons specified in (b) above on the same terms as applied prior to such death or termination;

(ii)    the trust agreement or declaration provides that any Membership Interest which is distributed from the trust (whether on termination of the trust or otherwise) is required to be distributed to one or more persons specified in (b) above;

(iii)    the trust agreement or declaration provides that the number of beneficiaries of the trust plus the number of beneficiaries who have received a distribution of Membership Interest will not exceed the number, if any, permitted by these Regulations;

(iv)    the trust agreement or declaration provides that the trust agreement or declaration cannot be amended in any respect which would violate the provisions of these Regulations and the trustee or trustees of the trust enter into an agreement with all of the other Members of the Company not to permit any amendment of such provision; and

-11-

(v)    the Member shall either have the power to revoke the trust, acting alone, or shall have the power to vote the Membership Interest held in the trust, to the extent the Membership Interest subject to the trust has voting rights;

provided that, the Membership Interest held by such Authorized Transferee shall remain subject to the provisions of these Regulations.

10.3    Right of First Refusal.

(a)    Voluntary Transfers.  Other than a transfer to an Authorized Transferee, no Member nor his Authorized Transferee (collectively, a "Selling Member") may sell, assign, pledge or otherwise dispose of all or any part of his or its Membership Interest now held or hereafter acquired, without first giving written notice (the "Notice of Sale") to the other Members (the "Remaining Members") and the Company.  The Notice of Sale shall include the name of the transferee and all material terms of the proposed transfer and, in the case of a transfer for fair value, shall be accompanied by a copy of the bona fide written offer to purchase such Membership Interest upon the terms set forth in the written notice.  The Notice of Sale to the Remaining Members and the Company shall be deemed for all purposes to give first the Remaining Members and then the Company, respectively, a first right of purchase (sometimes referred to as a right of first refusal) as provided herein.  If the Remaining Members and the Company decline or fail to exercise their respective first right of purchase within the time provided (as set forth in Section 10.3(c) hereof), the Member may, within 60 days from the date said right terminates, transfer the Membership Interest to the proposed transferee upon substantially the terms set forth in the Notice of Sale.

(b)    Transfer Events.

(i)    The Remaining Members and the Company shall have the right to purchase all of the Membership Interest, coupled with the Voting Rights, if any, of a Selling Member, as provided in Section 10.3(c), immediately upon the happening of any one or more of the following events (each a "Transfer Event"):

A.    the death of a Member;

B.    if a Member or his Authorized Transferee voluntarily files a petition under any bankruptcy or insolvency law or a petition for the appointment of a receiver, or makes an assignment for the benefit of creditors;

C.    if Member or his Authorized Transferee is subjected involuntarily to such a petition or assignment, or any creditor or other person obtains an attachment or other legal or equitable interest in any Membership Interest of a Member, and such involuntary petition, assignment or attachment is not discharged within 30 days after creation;

D.  if a Member or his Authorized Transferee is subject to a judgment, court order or decree or by operation of law is otherwise required to transfer his Membership Interest to a person or entity other than an Authorized Transferee or otherwise to divest himself of his Membership Interest;

E.  if an Authorized Transferee of the type described in Section 10.2(b) ceases to be controlled by the Member to the extent provided therein, but such occurrence shall be a Transfer Event only with respect to the part of the Membership Interest held by such Authorized Transferee, and the Member may terminate the Company's right of purchase under Section 10.3(b) with respect to such Membership Interest by causing it to be transferred back to the Member or to another person who continues to qualify as an Authorized Transferee.

(ii)  In the event of the death of a Member, which results in a Transfer Event hereunder, his executor or administrator shall, within 90 days after death, give written notice thereof to the Remaining Members and the Company and shall give the Remaining Members and the Company a first right of purchase as provided herein. The affected Member (referred to herein as a "Selling Member") shall, within 10 days of the occurrence of any other Transfer Event specified in paragraph 10.2(b)(i), give written notice thereof to the Remaining Members and the Company. If the Remaining Members and the Company decline or fail to exercise timely their respective first right of purchase as provided in Section 10.3(c), then the legal representative, beneficiary, trustee, assignee, receiver or other transferee who obtained the Membership Interest and Voting Rights, if any, by reason of the Transfer Event may retain the Membership Interest and such Voting Rights, if any, subject to the provisions of these Regulations.

(c)  First Right of Purchase.

(i)  Upon receipt of written notice of intent to make a voluntary transfer under Section 10.3(a) or upon the occurrence of a Transfer Event specified in Section 10.3(b), first the Remaining Members and then the Company shall have a right to purchase any or all of the Membership Interest and Voting Rights, if any, to which such notice or Transfer Event relates at the price and in the manner specified herein before any other action is taken to sell, assign, transfer, pledge, or otherwise dispose of the Membership Interest and Voting Rights. Such right shall continue for a period of 90 days from the receipt of written notice of a proposed transfer under Section 10.3(a) or the receipt of written notice of a Transfer Event under Section 10.3(b) and in any event shall continue for 15 days from the date of the receipt by the Remaining Members and the Company of any appraisal made pursuant to Section 10.4. Each of the Remaining Members shall have a first right of purchase with respect to the Membership Interest and Voting Rights, if any, to which such notice or Transfer Event relates, on a pro rata basis with the other Remaining Members based on such Remaining Member's ownership interest in the Company (calculated for purposes of this Section 10.3(c) as if the shares held by the Remaining

-13-

Members constitute 100% of the Membership Interest), such right existing for the first 30 days of the above referenced 90-day period; provided, however, that if the notice of Transfer Event relates to Membership Interests which are coupled with Voting Rights (as indicated on Schedule 4(a)), then only those Remaining Members who hold Membership Interests together with Voting Rights shall have a first right of purchase during such initial 30 days of the 90-day period.

In the event any Remaining Member declines or fails to exercise his first right of purchase within the specified time, a right of purchase relative to such Remaining Member's portion of the Membership Interest and Voting Rights, if any, offered for sale by the Selling Member shall be given to the other Remaining Member(s) on a pro rata basis with any other Remaining Member based upon such Remaining Members' ownership interest in the Company (calculated for purposes of this Section 10.3(c) as if the shares held by the Remaining Members constitute 100% of the Membership Interest) for the second 30 days of the above referenced 90-day period; provided, however, that if the declining Member is Steven Drooker or the Drooker 1997 Irrevocable Trust, the other of Steven Drooker or the Drooker 1997 Irrevocable Trust shall have a first right of purchase with respect to the Membership Interest and Voting Rights if any so declined to be purchased.

If, by notice to the Selling Member and the Company during such 60-day period, the Remaining Members decline to exercise their right of first refusal, or if such Members fail to act during such 60-day period, or if such Members elect to purchase only a portion of the Membership Interest and Voting Rights, if any, subject to transfer, then the Company shall have the right to exercise its right of first refusal during the remaining 30 days of the 90-day period, as to the Membership Interest and Voting Rights, if any, that was not purchased by the Remaining Members. In the event of appraisal pursuant to Section 10.4, any election of the Remaining Members to exercise their right of first refusal shall be superior to that of the Company if made during the first 15-day period referenced above. If either a Remaining Member or the Company elects to exercise its first right of purchase, the electing party shall so notify the holder of the Membership Interest and Voting Rights; if any, specifying the portion of the Membership Interest and Voting Rights, if any, and manner of payment.

(ii)    If a Transfer Event under Section 10.3(b)(i)(D) occurs as the result of a separation of a Member or Authorized Transferee from his spouse or the dissolution of his marriage, pursuant to which title to or ownership of any interest in any of such Member's Membership Interest and Voting Rights, if any, is transferred to any person other than such Member or an Authorized Transferee, then prior to the Remaining Members' and the Company's right of purchase, such Member shall have the first right to purchase from the owner or owners thereof any or all of such Membership Interest and Voting Rights, if any. Such option shall be exercisable by written notice from such Member to the Remaining Members and the Company and his spouse at any time within 90 days from the date of a written notice of such Transfer Event delivered under Section 10.3(b) and in any event shall continue for 15 days from the date of receipt by the Remaining Members and the Company of an appraisal made pursuant to Section 10.4. The purchase price and manner of payment for said Membership Interest shall be the same as provided in Sections 10.4(a) through 10.4(c) for purchase by the Remaining Members or the Company. To the extent that a Member or an Authorized Transferee fails to exercise his or



her option, then, in accordance with procedures set forth in Section 10.3(c) above, first the Remaining Members and then the Company shall have the right to purchase such Membership Interest and Voting Rights, if any, at any time within 90 days after the date that such Member or Authorized Transferee gives notice to the Remaining Members and the Company and his spouse that he will not exercise such option, or within 90 days after lapse of such option, whichever is earlier.

(d)    Transfers in Violation of Agreement.  If any transfer of Membership Interest or Voting Rights is made or attempted contrary to the provisions of these Regulations, or if the Membership Interest and Voting Rights, if any, is not offered to the Remaining Members and the Company as required herein, then, first the Remaining Members and then the Company shall have the right to purchase said Membership Interest and Voting Rights, if any, from the holder thereof or his transferee at any time before or after the transfer, as herein provided.  In the event that either the Remaining Members or the Company elect to a first right of purchase, they or it may do so by canceling or in the case of a Member, directing the Company to cancel, the Membership Interest and Voting Rights, if any, and depositing the purchase price determined hereunder in a bank account for the benefit of the Selling Members, whereupon such Membership Interest and Voting Rights, if any, shall be, for all purposes, canceled and neither the Selling Member nor any transferee shall have any rights as a Member of the Company with respect to such Membership Interest and Voting Rights, if any, for any purpose, including without limitation, voting rights and rights to Net Profits, Net Losses, and distributions of the Company's assets, until there has been compliance with all applicable provisions of these Regulations.  In addition to any other legal or equitable remedies which they may have, the Remaining Members and the Company may enforce their rights by actions for specific performance (to the extent permitted by law).

10.4    Purchase Price.

(a)    Except as otherwise provided in Section 10.4(d), the purchase price for Membership Interests and Voting Rights which either the Remaining Members or the Company (or a Member or Authorized Transferee under Section 10.3(c)(ii)) elects to purchase hereunder shall be the fair market value of the Membership Interest and Voting Rights, as hereafter determined, for all such interests and rights outstanding, without regard for whether the Membership Interest being purchased by a Remaining Member or the Company constitutes a minority or majority interest.

(b)    The fair market value for the Membership Interest hereunder shall be the fair market value of the Membership Interest, taking into consideration the accompanying Voting Rights, if any as last determined by unanimous vote of the Members holding Voting Rights prior to the date on which the first right of purchase hereunder arises.  The Members shall determine the value of the Membership Interests for purposes of these Regulations at least annually as of the last day of the Company's fiscal year, such determination to be made within four months after the end of the Membership Interest's fiscal year, or at such other time or times as they deemed proper, and the value so determined shall remain in effect until the next determination, but not longer than 16 months.  The value so determined shall automatically be equitably



adjusted to reflect any subsequent changes in the capital structure of the Company. The initial fair market value shall be determined by the parties hereto and shall be set forth on Exhibit 10.4(b) hereto.

(c)    If no determination of value under paragraph (b) shall remain in effect, the purchase price hereunder shall be the fair market value, as determined by appraisal, as of the last day of the fiscal quarter immediately preceding the date upon which the first right of purchase hereunder arises. Not later than 10 days after the date of receipt by the Remaining Members and the Company of notice of their respective right of first refusal, (i) the Company and the Remaining Members and (ii) the Selling Members (or in the case of death of a Member, the decedent's executor or legal representative), shall jointly select an appraiser or, failing the selection of a mutually acceptable appraiser within such period, within an additional 10 day period, the Remaining Members and the Company shall appoint an appraiser and the transferring or Selling Member (or in the case of the death of a Member, the decedent's executor or legal representative) shall appoint a second appraiser, and such two appraisers shall appoint a third appraiser, or failing action within such period by any party or the appraisers, any unappointed appraiser or appraisers shall be appointed by the American Arbitration Association, West Palm Beach, Florida, upon application of any party or appraiser. Within 20 days from his (their) appointment, the appraiser(s) shall proceed by majority vote, if necessary, to determine the value of the Membership Interest and such determination shall be final and binding upon all interested persons. The Company shall promptly furnish to the appraiser(s) such information concerning its financial condition, earnings, capitalization and business prospects as he (they) may reasonably request and shall direct the appraiser(s) to determine the value of the Membership Interest without a discount for illiquidity. Within such 20 day period, the appraiser(s) shall promptly notify in writing the Company, the Members and any other interested person known to the appraiser(s), of the final determination of value. The parties shall each pay the fees and expenses of any appraiser appointed by or for each of them, and shall pay equally the fees and expenses of a single mutually acceptable appraiser or the third appraiser, if selection of a third appraiser is necessary.

(d)    In the event of a proposed sale by any Selling Member, to a third party in a bona fide transaction for fair value, payable in cash or the equivalent, currently or in future installments, the price and terms upon which the Remaining Members or the Company may purchase the Membership Interest if they, or any of them, elect to exercise their respective first right of purchase, exercisable within the period specified in Section 10.3(c), shall be a price and terms substantially equivalent to those offered by such third party. The Members of the Company may impose reasonable requirements for ascertaining that such third party offer is a bona fide offer. The provisions of Section 10.4(a)-(c) shall apply to a proposed assignment, transfer, exchange, pledge or any other sale or disposition of Membership Interest which does not constitute a bona fide transfer for fair value (as determined by the Members of the Company).

10.5    Transferee Not Member in Absence of Consent.

(a)    Notwithstanding anything contained herein to the contrary (including, without limitation, Section 10.3 hereof), if all of the remaining Members do not approve by unanimous

written consent the proposed sale or gift of the transferring Member's Membership Interest or Economic Interest to a transferee or donee which is not a Member immediately prior to the sale or gift, then the proposed transferee or donee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. Such transferee or donee shall be merely an Assignee. No transfer of a Member's interest in the Company (including any transfer of the Economic Interest or any other transfer which has not been approved as provided herein) shall be effective unless and until written notice (including the name and address of the proposed transferee or donee and the date of such transfer) has been provided to the Company and the non-transferring Member(s).

(b)     Upon and contemporaneously with any sale or gift of a Transferring Member's Economic Interest in the Company which does not at the same time transfer the balance of the rights associated with the Economic Interest transferred by the Transferring Member (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), the Company shall purchase from the Transferring Member, and the Transferring Member shall sell to the Company for a purchase price of $100.00, all remaining rights and interests retained by the Transferring Member which immediately prior to such sale or gift were associated with the transferred Economic Interest.

ARTICLE XI
DISSOLUTION AND TERMINATION

11.1    Dissolution.

(a)     The Company shall be dissolved upon the occurrence of any of the following events:

(i)     when the period fixed for the duration of the Company shall expire pursuant to Section 2.5 hereof;

(ii)    as required by the Florida Act, and, unless required by the Florida Act, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member shall not cause the dissolution of the Company.

11.2    Winding Up, Liquidation and Distribution of Assets.

(a)     Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Managing Member shall immediately proceed to wind up the affairs of the Company.

(b)     If the Company is dissolved and its affairs are to be wound up, the Managing Member shall:

(i)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Managing Member may determine to distribute any assets to the Members and Assignees in kind);

(ii)    Allocate any net profit or net loss resulting from such sales to the Members' and Assignees' capital accounts in accordance with Article IX hereof;

(iii)    Discharge (or make provision for) all liabilities of the Company, including liabilities to Members and Assignees who are also creditors, to the extent otherwise permitted by law, other than liabilities to Members and Assignees for distributions and the return of capital, and establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the capital accounts of the Members and Assignees, the amounts of such reserves shall be deemed to be an expense of the Company); and

(iv)    Distribute to each Member cash or assets leaving an aggregate Gross Asset Value equal to such Member's Capital Account (as determined after taking into account all adjustments to the Capital Accounts for the taxable year, including the adjustments to the Gross Asset Values of the assets of the Company and any adjustments to the Capital Accounts of the Members arising therefrom under Section 8.3(b)(ii) and Section 8.3(a)), and the excess, if any, shall be distributed in proportion to the relative Company interests of the Members as shown on Exhibit 8.1 under the heading "Initial Share of Total Capital." Distributions of the proceeds of a financing or from the sale of property of the Company not in the ordinary course of business shall be accomplished in the same manner.

(c)    Notwithstanding anything to the contrary in these Regulations, upon a liquidation within the meaning of Section 1.704-I(b)(2)(ii)(g) of the Treasury Regulations, if any Member or Assignee has a negative capital account balance (after giving effect to all contributions, distributions, allocations and other capital account adjustments for all taxable years, including the year during which such liquidation occurs), such Member or Assignee shall have no obligation to make any capital contribution, and the negative balance of such Member's or Assignee's capital account shall not be considered a debt owed by such Member or Assignee to the Company or to any other Person for any purpose whatsoever.

(d)    Upon completion of the winding up, liquidation and distribution of the assets in accordance with these Regulations and the Florida Act, the Company shall be deemed terminated.

(e)    The Managers shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

12.1    Notices. Any notice, demand, or communication required or permitted to be given by any provision of these Regulations shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party

to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's, Assignees, and/or Company's address, as appropriate, which is set forth in these Regulations. Except as otherwise provided herein, any such notice shall be deemed to be given three business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

12.2    Amendments.  These Regulations may not be amended except by the unanimous written agreement of all of the Members.

12.3    Corporate Tax Status.  The Company shall not elect to be taxable other than as a partnership for Federal income tax purposes without the unanimous consent of the Members.

12.4    Heirs, Successors and Assigns.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by these Regulations, their respective heirs, legal representatives, successors and assigns.

12.5    Creditors.  None of the provisions of these Regulations shall be for the benefit of or enforceable by any creditors of the Company.

12.6    Counterparts.  These Regulations may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

[REMAINDER OF PAGE LEFT BLANK]

EXHIBIT 4(a)

| Initial Member | Membership Interest | Nature of Interest |
|---|---|---|
| Signature Consultants, Inc. | 50% | Voting |
| Steven Drooker | 25% | Voting |
| Drooker 1997 Irrevocable Trust | 25% | Non-Voting |

EXHIBIT 4(b)

| Initial Member | Voting Rights |
|---|---|
| Signature Consultants, Inc. | 50% |
| Steven Drooker | 50% |
| Drooker 1997 Irrevocable Trust | 0 |

## EXHIBIT 8.1

| Initial Member Contributions | Initial Capital Contribution | Initial Share of Total Capital |
|---|---|---|
| Signature Consultants, Inc. | $ 1,000.000 | 50% |
| Steven Drooker | $ 500.00 | 25% |
| Drooker 1997 Irrevocable Trust | $ 500.00 | 25% |

# Exhibit B

# SIGNATURE CONSULTANTS LLC
## Travel, Meals and Entertainment Policy

The purpose of this policy is twofold:

1) To clearly outline Signature Consultants policy and procedures for travel, meals and entertainment expenses, and
2) to provide each employee with the necessary guidelines to effect reimbursement for those expenses.

With respect to the reimbursement of expenses incurred on behalf of the Company, it is understood that each employee will thoroughly consider the business necessity of each expenditure and ensure commitments and obligations incurred are within the scope and spirit of this policy.

It is the employee's responsibility to:

- Spend the Company's money as carefully and judiciously as if it were his/her own.
- Check for accuracy of bills and other documents before paying or accepting them.
- Report all expenses and advances promptly and accurately with the required documentation, including a written explanation of the business purpose of all travel, meals and entertainment charges.
- Request reimbursement for business expenditures that are necessary and reasonable only. Employees are expected to neither lose nor gain financially.

It is the Company's responsibility to:

- Review all travel, meals and entertainment expense forms and reimburse its employees in a timely fashion.
- Inform employees of its reasons for disallowing reimbursement for travel, meals and entertainment expenses if such an event occurs.
- Treat each employee in a fair, equitable and professional manner with respect to requests for travel, meals and entertainment expense reimbursement.

## APPROVAL PROCESS

Upon completion of the Expense Report, the employee must obtain the Branch Manager approval and then submit the form and documentation required by the policy to the appropriate Services Group personnel. The report should be submitted by the 5th of each month for the previous month's expenses. After verification and approval, the reimbursement will be promptly included in with your next paycheck. Questioned items will be returned promptly to the employee for resolution.

## TRAVEL

All airline, hotel and car rental reservations and must be made through Lee Reed. If an employee, nevertheless, makes independent arrangements, reimbursement of such expenses may be denied and, in any case, will not be in excess of the lowest fare or rate obtainable by Lee. Exceptions may be made for emergency travel during time periods when Lee cannot be contacted.

Revised August 2, 2001

## BUSINESS USE OF PERSONAL VEHICLE

As a general rule, employees are entitled to reimbursement for the usage of a personal vehicle to travel on behalf of the Company, provided that: the use of the car is for business use other than normal commuting from the employee's home to his/her normal place of work.

Employees will be reimbursed for the business miles incurred in accordance with IRS regulations. This flat rate reimburses the employee for gasoline, oil, maintenance, insurance, interest and depreciation.

## BUSINESS RELATED MEALS AND ENTERTAINMENT

In general, it is the Company's policy to reimburse its employees for business meals and entertainment expenses that are deductible in accordance with existing IRS regulations, which require expenditure to be appropriate and reasonable. The reasonable cost of meals and/or entertainment is a reimbursable expense, provided that:

- the expense is **properly documented**; and
- the meal and/or entertainment is provided in conjunction with business-related travel or a bona fide business discussion.
- the cost is within the employee's budgeted allowance.

The policy is to require documentation that satisfies IRS requirements before an employee is entitled to reimbursement for any meal or entertainment expense. Proper documentation consists of the following information being provided on a T & E Expense Report:

- Cost (including tax and tip)
- Date
- Name and location of establishment
- Nature of entertainment
- Names, titles and business affiliations of all persons attending
- **Business purpose. (Note "Business" does not adequately describe the business purpose)**

The Company also requires receipts for all meals and/or entertainment expenses in excess of $10.

As a general rule, meals should not exceed $15 per person and the location for entertainment should be selected accordingly.

In order to qualify as a deductible expense, IRS regulations, and consequently the Company's policy for reimbursement, provide that the following conditions must be satisfied in addition to the reporting requirements discussed previously.

1. The cost of business meals or entertainment must be reasonable and such expense must be an ordinary and necessary expense directly related to and incurred in the conduct of a trade or business or the production of income on behalf of the company. To be "reasonable", meal costs must exclude excessive charges for alcohol and must be incurred at mid-priced restaurants.
2. It must be demonstrated that the employee actively conducted business and that the business discussion was the principal reason for the combined entertainment and business time spent together.

3. Business entertainment immediately preceding or following a substantial and bona fide business discussion is considered a tax-deductible business expense and is reimbursable.

## Business Meals and Entertainment with Other Company Employees

It is the Company's policy NOT to reimburse employees for expenses incurred when two or more employees lunch or dine together, or otherwise entertain one another. The cost for such expenditure will be reimbursed if there is a strong overriding business purpose for incurring the expenditure.

When a group of employees meets the above requirements, the highest-ranking employee should pay the bill.

## TELEPHONE CALLS

In general, telephone calls are reimbursable while traveling on Company business, including a reasonable amount for personal contact with family members.

Sales people will be reimbursed for bulk minute plans as approved by their branch managers.

Recruiters will only be reimbursed for itemized calls during evenings and weekends.

## TOLLS AND PARKING

Tolls and parking expenses incurred while traveling or otherwise conducting Company business are reimbursable. Expenses should be accompanied by an original receipt and listed in detail on a T & E Expense Report. Tolls and parking expenses incurred while commuting to an employee's normal place of business are not reimbursable.

## MISCELLANEOUS EXPENSES

In general, all reasonable miscellaneous expenses incurred by an employee in the conduct of authorized company business are reimbursable. These expenses must be reported on a T & E Expense Report and must be accompanied by the original receipt and explanation of the business purpose.

## Tips

Reasonable gratuities to porters at hotels and transportation centers will be reimbursed.

## Laundry and/or Dry Cleaning Services

Laundry, dry cleaning and pressing services away from home are reimbursable when a business trip exceeds five business days. This expense must be reasonable and supported by actual receipts.

## Taxis

Receipts should document taxi fares for all fares over $10.

Revised August 2, 2001

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-60464-CIV-TORRES/DIMITROULEAS
(Consent Case)

SIGNATURE CONSULTANTS, INC.
AND JAY L. COHEN,

     Plaintiffs,

v.

STEVEN DROOKER,

     Defendant.

_____/

## MEMORANDUM IN SUPPORT OF DROOKER'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This summary judgment motion seeks dismissal of all claims for four discrete and dependent reasons. First, Plaintiff Jay L. Cohen ("Cohen"), has no direct equity ownership in Signature Consultants LLC ("Signature LLC" or the "Company") and thus lacks standing to bring claims under Counts I and II. Second, Plaintiff Signature Consultants, Inc. ("Signature, Inc.") lacks standing because the individual claims it brings are really derivative claims.

Third, the claims asserted in Count II must be dismissed on their merits because all transactions between Signature LLC and Drooker's respective entities were disclosed, approved, and were fair to the Company at the time they were authorized.

Fourth and last, Count III must be dismissed as moot. The operating assets of the entity (i.e., Netis) to which Plaintiff Cohen's claim is related has been sold to a third party, and resultantly, Cohen's allegations no longer present an actual controversy.

## UNDISPUTED FACTS

Signature LLC is a limited liability company formed in May of 1997 by Drooker and Cohen. Drooker is a citizen of Massachusetts; Cohen and Signature, Inc. are citizens of Florida. A true and accurate copy of Plaintiffs' Complaint ("Compl.") is attached to the Affidavit of Steven Drooker ("*Drooker Aff.*") as Ex. 3 (Compl., ¶¶ 4-5). Drooker owns 25% of Signature LLC; Signature, Inc. owns 50%; and the Drooker 1997 Irrevocable Trust owns the remaining 25%. *Drooker Aff.*, ¶ 2; A true and accurate copy of Signature LLC's Regulations ("Operating Agreement"), reflecting each party's respective ownership interests are attached to the *Drooker Aff.* as Ex. 1. Cohen is the sole shareholder of Signature, Inc. *Drooker Aff.*, ¶ 2; Ex. 3 (Compl., ¶ 4). Drooker and Cohen[1] are the managers of Signature LLC. *Drooker Aff.*, Ex. 2.

As a limited liability company, Signature LLC is governed by F.S. Chapter 608 and its Operating Agreement. *Drooker Aff.*, Ex. 1. F.S. 608.422(4)(a) provides "[e]ach manager has equal rights in the management and conduct of the *limited liability* company's business." These provisions are not modified by Signature LLC's Operating Agreement. *Drooker Aff.*, Ex. 1.

In March 2004, Cohen and Signature, Inc. filed a Complaint against Drooker. Count I alleges that Drooker breached alleged fiduciary duties owed to Cohen and Signature, Inc. individually because Drooker's wife's Boston based company, of which Drooker had a 1% ownership interest for a period of time, competes with Signature LLC's A&F business that is located in Charlotte, North Carolina. *Drooker Aff.*, ¶¶ 14-15, Ex. 3 (Compl., ¶¶ 17, 36-40).

In addition, Count II alleges that Drooker breached alleged fiduciary duties owed to Cohen and Signature, Inc. (again in their individual capacities) with respect to a real estate lease and a services agreement entered into between Signature LLC and entities in which Drooker has

---

[1] Signature LLC's "Co-Management Agreement" provides that Signature, Inc. is a manager of the Company. Because Cohen is the sole-shareholder and employee of Signature, Inc., further references to Signature, Inc. as a manager are omitted for the purposes of this Motion.

some interest. The first of these transactions is the lease of real property from the 16 Wheeling Ave., Trust ("Wheeling Trust"); the second is a agreement with Drooker's wife's company to provide it with "back-office" financial services for a fee. *Drooker Aff.*, Ex. 3 (Compl. ¶¶ 24-26).

### 1. The Wheeling Avenue Lease

In spring 2000, Signature LLC retained commercial real estate broker Bruce Levine ("Levine") to locate office space to replace the Company's office then located in Woburn, Massachusetts. *Drooker Aff.*, ¶ 19; Affidavit of Bruce Levine ("*Levine Aff.*"), ¶ 9. Prior to this time, Signature LLC's Woburn office ("Woburn Office") consisted of approximately 2,000 square feet of commercial space. *Levine Aff.*, ¶ 4; *Drooker Aff.*, ¶ 18. Based on the Woburn Office's projected growth, Signature LLC informed Levine that it was interested in leasing approximately 10,000 square feet of commercial space for its new location. *Levine Aff.*, ¶ 6; *Drooker Aff.*, ¶ 18.

Throughout that spring, Levine showed Signature LLC representatives several different commercial spaces. *Levine Aff.*, ¶ 6; *Drooker Aff.*, ¶ 20. Eventually, Signature LLC decided to pursue a lease for commercial space at Unicorn Park in Woburn. *Levine Aff.*, ¶ 8; *Drooker Aff.*, ¶ 20. Signature LLC entered into a non-binding Letter of Intent with the owner and putative landlord, RREEF, Inc., for a leasehold at that property. *Levine Aff.*, ¶ 8; *Drooker Aff.*, ¶ 21. The letter of intent ("LOI") outlined the following basic business terms: (1) approximately 10,000 square feet; (2) five year term; (3) $30.00 per square foot "as is", increasing by $1.00 per square foot each year. *Levine Aff.*, ¶ 9[2]; *Drooker Aff.*, ¶ 21.

After signing the LOI, Signature LLC abandoned the Unicorn Park space in favor of a similar-sized commercial space at 16 Wheeling Avenue, a property owned by the 16 Wheeling Ave. Trust ("Wheeling Trust"). *Drooker Aff.*, ¶ 22. Drooker has an interest in the Wheeling

---

[2] Neither Levine nor RREEF's broker retained the non-binding Letter of Intent.

3

Trust which was fully disclosed to Cohen prior to the drafting of the lease securing the transaction. *Drooker Aff.,* ¶ 22. A true and accurate copy of a counter-signed letter, disclosing Drooker's interest is attached to the *Drooker Aff.* as Ex. 5. The financial terms of the lease with the Wheeling Trust were more beneficial to Signature LLC than were the terms of the proposed lease with RREEF. *Drooker Aff.,* ¶ 22.

A draft lease was prepared by the Wheeling Trust's Counsel Rob Levy. Mark Nussbaum, Signature LLC's COO, and also a former practicing attorney with real estate expertise, reviewed the lease on behalf of Signature LLC. See excerpts of the Nussbaum Deposition Transcript ("Nussbaum Dep.") attached to the *Stoll Aff.* as Exhibit A, p. 23:14-25; 24:1-5; *Drooker Aff.,* ¶ 25. Additionally, Nussbaum telephoned real estate brokers in the area and determined that the cost per square foot to Signature LLC under the lease was fair market price. *Stoll Aff.,* Ex. A (Nussbaum Dep., p. 24:6-20); see *Drooker Aff.,* ¶ 25. Ultimately, Cohen executed the lease on behalf of Signature LLC on January 1, 2001. *Drooker Aff.,* ¶ 25; A true and accurate copy of the executed lease is attached to the *Drooker Aff.* as Ex. 6. Signature LLC has occupied the leased premises continuously since January 2001, is current in its rent obligations, and has never asserted any basis for default under the lease. *Drooker Aff.,* ¶ 26; *Stoll Aff.,* Ex. A (Nussbaum Dep., p. 89:11-14).

The sole basis alleged in the Complaint as the putative breach of fiduciary duty is that Drooker caused Signature LLC to lease more square footage than it needed in 2001 or would have needed in the foreseeable future. *Drooker Aff.,* Ex. 3 (Compl., ¶ 25). *Stoll Aff.,* Ex. A (Nussbaum Dep., p. 91:20-25; p. 92:1-8). Neither Nussbaum nor Cohen raised this concern at the time the lease was entered into.

4

2. Back Office Services

In 1997, Drooker's wife, Selena Drooker, founded a secretarial placement business originally known as Legal Connection Group, now Beacon Hill Staffing Group ("Beacon Hill"). *Drooker Aff.*, ¶ 15. In or about early 2000, Signature LLC entered into an oral agreement with Beacon Hill to provide certain "back office" or administrative services to Beacon Hill in return for $15,000, annually. *Drooker Aff.*, ¶ 28, Ex. 7. On April 5, 2001, Beacon Hill and Signature LLC memorialized the arrangement described above in a Management Services Agreement ("the MSA"). *Drooker Aff.*, ¶29; A true and accurate copy of the MSA is attached to the *Drooker Aff.* as Ex. 8. The MSA was jointly drafted by Drooker and Ken Gamache ("Gamache"), Signature LLC's CFO. A true and accurate copy of an email in which Gamache reveals he in part drafted the MSA is attached to the *Stoll Aff.* as Ex. B.

The MSA provided for monthly fees of $3,000 to be paid to Signature LLC, representing an annual increase of $21,000 over the original oral arrangement. *Drooker Aff.*, ¶ 29, Ex. 8. The MSA also allowed for termination by either party simply by giving "thirty (30) days written notice." *Drooker Aff.*, ¶ 30, Ex. 8.

Between 2001 and 2003, Beacon Hill's business grew considerably. Accordingly, in or about 2002, the MSA was orally amended to increase Beacon Hill's monthly payment obligation to $4,000 per month. *Drooker Aff.*, ¶ 31; A true and accurate copy of a spreadsheet detailing fees paid by Beacon Hill to Signature LLC is attached to the *Drooker Aff.* as Ex. 9.

In or about September 2003, Gamache, as evidenced by an internal e-mail, determined that Beacon Hill had grown to such a size that it was no longer profitable to continue providing back office services under the MSA, as amended. A true and accurate copy of the internal email is attached to the *Stoll Aff.* as Ex. C. Subsequently, Gamache sent a letter to Andrew Wang

5

<u>ARGUMENT</u>

I.    <u>COHEN LACKS STANDING TO BRING CLAIMS IN COUNT I AND II OF THE COMPLAINT</u>

    A.    Drooker Does Not Owe A Duty To Cohen

Count I of Plaintiffs' Complaint alleges that Drooker breached a fiduciary duty owed to Cohen and Signature, Inc. in their individual capacities. Specifically, the Complaint alleges that Drooker breached" "a duty of loyalty" "to the detriment and damage of," Signature Inc. and Cohen. *Drooker Aff.*, <u>Ex. 3</u>, (<u>Compl.</u>, ¶¶ 37-38). Similarly, in Count II, Plaintiffs allege that "Drooker owed, and owes, to [Signature, Inc. and Cohen] the duty to refrain from acting in a manner that either creates a conflict of interest and/or breaches his obligation of good faith and fair dealing with respect to Signature LLC." *Drooker Aff.*, <u>Ex. 3</u> (<u>Compl.</u>, ¶ 42). On these two Counts, Plaintiffs seek damages of "in excess of $1,000,000.00" *Drooker Aff.*, <u>Ex. 3</u> (<u>Compl.</u>, ¶ 40) and "in excess of $250,000." *Drooker Aff.*, <u>Ex. 3</u> (<u>Compl.</u>, ¶ 45), respectively. Cohen lacks standing to pursue these claims and thus summary judgment must be entered. As a matter of law, no such duty is owed to Cohen because he is not an owner of Signature LLC.

In the first instance, like traditional corporations, fiduciary duty in LLC's extends only between managers and members. Thus, F.S. Chapter 608 provides, in pertinent part:

> 608.4225  <u>GENERAL STANDARDS FOR MANAGERS AND MANAGING MEMBERS</u>.
>
> (1) Subject to ss. 608.4226 and 608.423, each manager and managing member shall owe a duty of loyalty and a duty of care to the limited liability company and *all of* the members of the limited liability company.

F.S. 608.4225 (emphasis added).

Cohen is not a member of Signature LLC. He is merely the sole shareholder of Signature, Inc. and Signature, Inc. is a member of Signature LLC. Cohen's status as a

shareholder of Signature, Inc., does not confer upon him standing to bring an action in his individual capacity for injuries purportedly suffered by Signature, Inc.

"It is basic hornbook law that 'corporate property is vested in the corporation itself, and not in the individual stockholders, who have neither legal nor equitable title in the corporate property.'" Miner v. Bay Bank & Trust Co., 177 B.R. 104, 106 (Bankr. N.D. Fla. 1994); Alario v. Miller, 354 So. 2d 925, 926 (Fla. 2d DCA 1978) ("damages only indirectly sustained by the stockholder as a result of injury to the corporation, does not imbue the stockholder with standing); Holland v. United States, 59 Fed. Cl. 735, 740 (2004) ("Courts have consistently held that shareholders lack standing to sue in their individual capacities where their losses from the alleged injury to the corporation amount to nothing more than a diminution in the value of their stock or a loss of dividends."). Moreover, even a sole shareholder can not bring an action to recover personally for a wrong done to the corporation. Manson v. Anca Stacescu, et al., 11 F.3d 1127, 1131 (2d. Cir. 1993) (sole shareholder of an injured corporation does not have standing to bring an individual action under RICO); Sharp Electr. Corp. v. Uriel Yoggev, 1995 WL 263533 (E.D. Pa. 1995)(sole stockholder has no standing to sue in his individual capacity for damages that are derivative of harm inflicted on the corporation); Yetiv v. Harris County Appraisal District, 1999 WL 213239 (Tex. App. 14th Dist. 1999)(same); Heilman v. Meridan Mut. Ins. Co., 1997 WL 33344229 (Mich. App. 1997) ("sole shareholder lacks standing to sue in his individual capacity for damages sustained by his corporation."). Accordingly, Cohen, as sole-shareholder of Signature Inc., lacks standing to assert claims for wrongs committed to Signature Inc. in his individual capacity.

When a party without standing purports to commence an action, the trial court is deprived of subject matter jurisdiction. Galindo Del Valle v. AG, 213 F.3d 594, 599 (11th. Cir. 2001).

Standing is a jurisdictional prerequisite to every case and thus may be raised at any stage of a proceeding. Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 255 (1994). Because Cohen lacks standing to sue in his individual capacity, this Court lacks jurisdiction to hear his claims and he must be dismissed as a party in this action with respect to Counts I and II of Plaintiffs' Complaint.

## II.    ALL CLAIMS ASSERTED IN COUNTS I AND II ARE DERIVATIVE AND MUST BE DISMISSED

Counts I and II must also be dismissed because though brought as direct claims, they are actually derivative and Signature LLC has not and cannot be named as a party. The Complaint alleges that Drooker has breached fiduciary duties owed to co-member, Signature, Inc. and non-member Cohen[3], but alleges harm solely to Signature LLC's business. Where the gravamen of a complaint is harm to the corporation's business, the claim is derivative. E.g., Fox v. Professional Wrecker Oper. of Fla., Inc., 801 So. 2d 175, 179 (5th Fla. DCA 2001); see also Weber v. King, 110 F. Supp. 2d 124, 128 (E.D.N.Y. 2001); Glod v. Baker, 851 So. 2d 1255, 1264-1265 (La. App. 3d Cir. 2003); Elmhurst Consulting, LLC v. Gibson, 219 F.R.D. 125, 127 (N.D. Ill. 2003). Put differently, where the alleged injury sustained is injury that all shareholders of a corporation share in like manner, the harm is derivative. Fox, 801 So. 2d at 179 (a direct action "seeks redress for an injury suffered directly by the stockholder who is separate from any injury sustained by the other stockholder").

Although Plaintiffs refer to Drooker breaching duties to "Signature-Cohen", the Complaint manifestly alleges that Drooker "directly compete[d] with Signature LLC" and that Drooker acted in a manner that caused a conflict of interest with respect to Signature LLC, to "the detriment of Signature LLC." *Drooker Aff.*, Ex. 3 (Compl., ¶¶ 38, 43). Because Signature,

---

[3] For the purposes of this argument, references to Cohen are ignored for the reasons set forth in Argument I above.

9

Inc.'s claims seek redress for injuries supposedly caused to Signature LLC's business those are injuries suffered by all shareholders equally. E.g., Glod, 851 So.2d at 1265 (action based on conduct "that causes loss to the corporation is an asset of the corporation and may only be asserted secondarily by the shareholders"). Since Signature, Inc. has no direct claim based on the harm to Signature LLC alleged in the Complaint, the Complaint fails to state a claim on which relief can be granted and must be dismissed.

Moreover, it is not possible for Signature, Inc. to cure this defect by restyling the Complaint as a derivative action. This is because to do so would destroy diversity jurisdiction as a limited liability company is deemed to be a citizen of every state in which its members are citizens. E.g., Rollings Greens MHP, L.P. v. Comcast SCH Holdings LLC, 374 F.3d 1020, 1022 (11th Cir. 2004). See also Cosgrove v. Bartolotta, 150 F.3d 729, 731 (7th Cir. 1998); Weber, 110 F.Supp. 2d at 128. Signature Inc. is a Florida citizen; Drooker is a citizen of Massachusetts; Signature LLC is a citizen of both states. Joinder would destroy complete diversity, and is thus not possible.

It is well settled that the corporation is a necessary and indispensable party under Fed. R. Civ. P. 19 when a derivative claim is brought. E.g., Francini v. International Marble Trades, Inc., 546 So. 2d 777, 779 (3d Fla DCA 1989) (citing Liddy v. Urbanek, 707 F.2d 1222 (11th Cir. 1983)). Elmhurst, 219 F.R.D. at 125 (citations omitted). See also Weber, 110 F. Supp. 2d at 130 (unnamed corporation in derivative action necessary and indispensable because in absence of corporation, defendant may be subject to multiple suits; and as corporation and its shareholders are separate legal entities, actions of plaintiff-shareholder may prejudice rights of corporation). Because the claims are derivative in nature and Signature LLC is a necessary and indispensable

10

party that cannot be joined in this action, this court lacks subject matter jurisdiction over Counts I and II and accordingly, those counts must be dismissed.

## III.    THE PLAINTIFF CANNOT ESTABLISH A FIDUCIARY DUTY CLAIM BASED ON SELF-DEALING

Beyond the absence of standing, Count II of the Complaint must be dismissed because Plaintiffs can never establish essential elements of the fiduciary duty claims. Both the lease transaction and the MSA complained of in Plaintiffs' Complaint were permissible, were approved by Cohen, and did not constitute self-dealing or wrongful behavior of any kind. Although transactions between a manager and managing-member of a limited liability company are looked upon with scrutiny, they are expressly permitted by both applicable law and all governing documents relevant to this action.

### A.    The Summary Judgment Standard

Summary judgment is appropriate where no genuine issues of material fact exists and the moving party is entitled to a judgment as a matter of law. Bost v. Fed. Ex. Corp., 372 F.3d 1233, 1237 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); Fed. R. Civ. P. 56(c). A movant must demonstrate that the non-moving party lacks the necessary evidence to support an essential element of his or her claim. Lowe v. Aldridge, 958 F.2d 1565, 1569 (11th Cir. 1992). Conversely, to survive a motion for summary judgment, a plaintiff must establish the necessary elements of his or her claims, and demonstrate that genuine issues of material fact exist. Id.

### B.    Elements of the Putative Fiduciary Duty Claims

Although Plaintiffs do not plead with clarity, it may be presumed that the putative breach of fiduciary duty alleged is some specie of the duty of loyalty or to refrain from self-dealing. The elements of a duty of loyalty claim include 1) the existence of a fiduciary relationship; 2)

11

dealing with the beneficiary as an adverse party; 3) without the beneficiary's knowledge; and 4) causing damage. A self-dealing claim, requires proof that the 1) fiduciary took unfair advantage of the beneficiary; 2) in a transaction where the fiduciary fails to disclose his interest in that transaction. E.g., The Revenue Markets, Inc. v. Amherst Surety Ins. Co., 35 F.Supp. 2d 899 906-907 (S.D. Fla. 1998); see also Steinman v. Levine, 2002 WL 31761252, *12 (Del. Ch. Nov. 27, 2002).

C.    No Fiduciary Claim Can Exist in the Face of Cohen's Knowledge and Ratification

There is no dispute that the lease transaction and the MSA involve entities in which Drooker had or has an interest. The Plaintiffs have characterized this fact as creating a "conflict of interest", which the Complaint relies on as decisive in and of itself. *Drooker Aff.*, Ex. 3 (Compl., ¶¶ 41-45). But the Florida Limited Liability Act provides otherwise. Specifically, Section 608.4225(d) states that "[a] manager or managing member does not violate a duty or obligation . . . merely because the manager's or managing member's conduct furthers such manager's or managing member's interests." F.S. 608.4225(d). Indeed, Section F.S. 608.4225(e) expressly permits a manager to transact business with the limited liability company.

The FLLCA goes so far as to provide managers or managing members engaging in common or interested transactions with a "safe harbor" of sorts when any of the following three prongs are met – disinterested management approval, shareholder approval, or fairness at the time the transaction occurred. F.S. 608.4226. Specifically, F.S. 608.4226 provides, in pertinent part:

> (1) No contract or other transaction between a limited liability company and one or more of its members, managers, or managing members . . . shall be either void or voidable because of such relationship or interest. . . if:

(a) The fact of such relationship or interest is disclosed or known to the managers or managing members or committee which authorizes, approves, or ratifies the contract or transaction by a vote or consent sufficient for the purpose without counting the votes or consents of such interested members, managers, or managing members.

(b) The fact of such relationship or interest is disclosed or known to the members entitled to vote and they authorize, approve, or ratify such contract or transaction by vote or written consent; or

(c) The contract or transaction is fair and reasonable as to the limited liability company at the time it is authorized by the managers, managing members, a committee, or the members.

F.S. 608.4226(1)(a)-(c).

Because the FLLCA takes its conflict provision quoted above from corporate law, (F.S. 607.0832) and because section 608.4226 has not yet been interpreted by Florida's courts, a review of corporate law principles is helpful in determining the appropriate applicability of the section. One court interpreting section 608.0832 has held that a "conflict of interest transaction is not voidable if an approval, either by a majority of the disinterested directors or shareholders is obtained, and the transaction was fair." In re Sunrise Island, Ltd., 203 B.R. 171, 175 (Bankr. N.D. Okla. 1996). The Supreme Court of Delaware, while interpreting similar statutory language to section. 608.0832, commented that the section "removes an 'interested director' cloud when its terms are met." Marciano v. Nakash, 535 A.2d 400, 404 (Del. 1987) (requiring disclosure, ratification, and a showing of intrinsic fairness).

## D.    The Lease Transaction is Not Void Nor Voidable

### 1. Drooker Disclosed His Interest in the Wheeling Trust

There is no dispute that Cohen was fully aware of Drooker's ownership interest in the Wheeling Trust at the time the lease was executed. Indeed, Attorney Levy sent a letter to Cohen

13

in which he disclosed: "The Landlord is an entity in which Steven has an interest." *Drooker Aff.*, Ex. 5. Because Levy's letter served as an agreement and acknowledgement of a conflict waiver with regard to Levy's representation of the Wheeling Trust, it required a signature. *Drooker Aff.*, ¶ 23, Ex. 5 Nussbaum signed the letter on behalf of Signature LLC and Cohen, irrefutably showing knowledge of Drooker's interest. *Drooker Aff.*, ¶ 23, Ex. 5, Ex. 7.

### 2. Cohen Approved or Ratified the Transaction

Not only was Cohen aware of Drooker's interest in the Wheeling Trust, but Cohen approved and ratified the transaction on behalf of Signature LLC. Pursuant to Drooker's request, Levy prepared a draft lease. *Drooker Aff.*, Ex. 6. Nussbaum, Signature LLC's COO, an attorney with real estate experience, and Cohen's personal friend, reviewed the draft on behalf of the Company. *Drooker Aff.*, ¶ 25; *Stoll Aff.*, Ex. A (Nussbaum Dep., p. 19:19-24). After negotiations regarding the lease provisions ceased, Cohen himself executed the lease. *Drooker Aff.*, ¶ 25, Ex. 6. Neither a breach of loyalty nor a self-dealing claim can exist where the complaining party was informed of the transaction and approved. See O'Malley v. Buris, 202 WL 453 928, *8 (Del. Ch. March 18, 2002) (no claim for breach of duty of loyalty based on self-dealing in face of full disclosure).

### 3. The Lease Transaction Was Fair at the Time it Was Made

The lease transaction was fair and reasonable at the time it was authorized. In fact, the gravamen of Plaintiffs' Complaint with respect to the lease does not even attack the fairness of the lease itself. Instead, Plaintiffs complain that the square footage leased from the Wheeling Trust was in excess of the amount of space necessary for the Company's Woburn Office.[4] Accordingly, Plaintiffs seek not to invalidate the lease itself, but instead seek to obtain a back-

---

[4] Nussbaum contended in his deposition that Signature LLC currently uses approximately 60% of the space it leased in Woburn. *Stoll Aff.*, Ex. A (Nussbaum Dep., p. 22:15-16).

door remedy; essentially demanding a rebate for the percent of square footage unused at the going lease rate.[5]

First, the Complaint implicitly assumes that Drooker made the decision on his own. That is not the case. As shown above, Cohen executed the lease. Under both the FLLCA and the Operating Agreement, Cohen had the power as co-manager to block the transaction. Not only did he not do so, but he remained silent as to any perceived inequity for over three years.

What Plaintiffs really appear to complain of, then, is at most an error in Drooker's business judgment regarding the space needed to accommodate Company's Woburn Office growth needs in the future. Specifically, Plaintiffs have asserted, through Nussbaum, that "based on the years of experience that Drooker had in the staffing business that he could not reasonably project that the business would grow fast enough to occupy the square footage that the company he was 25% percent owner of, was going to pay rent on." *Stoll Aff.*, Ex. A (Nussbaum Dep., p. 91:24-25; 92:1-5).

The FLLCA, however again protects managers in an effort to prevent personal liability for management or policy decisions that later seem unsuccessful or ill-informed. Specifically, F.S. 608.4225 provides, in pertinent part:

> (1)    A manager or a managing member shall not be personally liable for monetary damages to the limited liability company, *its members*, or any other person for any . . . decision . . . regarding management or policy decisions by a manager or a managing member, unless:
>
> (a) The manager or managing member breached or failed to perform the duties as a manager or managing member, and
>
> (b) The manger's or managing member's breach of, or failure to perform, those duties constitutes any of the following:

---

[5] Presumably the claim would be for Signature, Inc.'s ½ interest in so much of the rent paid by Signature LLC on space that was not needed.

15

*   *   *

> 2.  A transaction from which the manager or managing member derived an improper benefit, either directly or indirectly.

*   *   *

(2)    A manager or managing member is deemed not to have derived an improper personal benefit from any transaction if the transaction and the nature of any personal benefit derived by the manager or managing member are not prohibited by state or federal law or the articles of organization or operating agreement and, without further limitation, the transaction and the nature of any personal benefit derived by a manager or managing member are disclosed or known to the members and the transaction was authorized approved, or ratified by the vote of a majority-in-interest of the members other than the managing member, or the transaction was fair and reasonable to the limited liability company at the time it was authorized by the manager or managing member, notwithstanding that a manager or managing member received a personal benefit.

F.S. 608.4228.

Thus, where, as here, a managing-member, Drooker, makes a decision with respect to a self-interested transaction,[6] he or she is protected from personal liability where: (1) the transaction is not prohibited by law or any relevant governing documents; (2) the manager or managing member's interest was disclosed to the members; and (3) the transaction was approved or ratified by vote or the transaction was fair.

Reading F.S. 608.4226 and F.S. 608.4228 together, when a transaction is deemed not void or voidable under the former section, a manager or managing member enjoys protection from liability for their "business judgments" with respect to the transaction. Thus, because Drooker fully disclosed his interest to Cohen, Cohen approved the transaction by signing the

---

[6] Again, Drooker did not make this decision alone; Cohen his co-manager collaborated and signed the lease.

16

lease, and Plaintiffs fail to attack the fairness of the transaction itself, Drooker is entitled to the safe harbor provided in F.S. 608.4228.

Moreover, as is plain from the allegations in the Complaint, the Nussbaum Deposition testimony, and the failure of any party to object to any aspect of the lease for over three years, the most charitable interpretation that can be placed on this aspect of Plaintiffs' claim is that the breach is predicated on the failure to predict the future (i.e., that the future growth would catch up with the amount of space demand). Fiduciary duty claims cannot be predicated on failure to accurately predict the future. See, e.g., Malone v. Commonwealth Edison Co., 1999 U.S. Dist. LEXIS 16172, *25 (N.D. Ill. 1999) (finding that an ERISA fiduciary is under no obligation to predict the future); Fuller v. Perry, 223 Ga. App. 129, 132 (1996) (defendant's statements relating to future events involving a third party could not form the basis for a fiduciary duty claim).[7]

### E.    The MSA Is Not Void or Voidable

The MSA between Beacon Hill and Signature LLC is not void or voidable because Drooker can satisfy the requirements of F.S. 608.4226. Specifically, Drooker's former interest, albeit a small one, was known to Signature LLC. Additionally, Signature LLC provided the back office services referenced in the Agreement since as early as 2000 by virtue of an oral agreement. Last, the terms of the Agreement were fair and reasonable at the time executed. Plaintiffs merely complain that the terms became unfair due to Beacon Hill's growth. What

---

[7] It is emphasized that Signature LLC has never lodged any complaint about the lease itself. Its continuing adherence to the lease terms cannot therefore be a basis for a fiduciary duty claim. See Steinman, 2002 WL 31761252 at *12 (duty of loyalty claim fails where corporation was merely paying money legally owed to entity in which a director has fully disclosed interest).

Plaintiffs fail to mention is that the Company was entitled to escape the terms of the Agreement on 30 days notice but failed to do so because of the Company's own admitted neglect.[8]

### 1. Drooker's Interest in Beacon Hill Was Known to Cohen

Drooker's interest in Beacon Hill was known to Cohen since at least as early as 2000. This knowledge is evidenced by the disclosure of Drooker's interest in Beacon Hill in Signature LLC's CFS's each year since 2000. For example, the 2000 CFS provides:

**NOTE 5-RELATED PARTY TRANSACTIONS**

> As of December 31, 2000, the Company was owed $111,503 from an affiliate wholly owned[9] by one of the Company's partners. During the year ended December 31, 2000 the Company provided certain accounting and administrative services to this affiliate and recognized other income in the amount of $15,000 during the year for those services.

*Drooker Aff.*, Ex. 7. The CFS's for the following three years contains similar disclosures, with only the respective dollar amounts changing. *Drooker Aff.*, Ex. 7.

### 2. The Agreement Was Ratified by Cohen

The Company has always recognized the MSA as its own despite Drooker's execution of it on behalf of the Company. For example, in a letter sent by Gamache on behalf of the Company, he states that "[w]e at Signature have found ourselves performing considerably more services on behalf of Beacon Hill than was contemplated in <u>our</u> Services Agreement dated April 5, 2001." *Drooker Aff.*, Ex. 10 (emphasis added). Moreover, Gamache conceded in a June 3, 2002 email that he, at least in part, drafted the Agreement. *Stoll Aff.*, Ex. B. Last, the Company terminated the MSA in accordance with its 30 day termination provision. *Drooker Aff.*, Ex. 10.

---

[8] Drooker cannot be liable for Signature LLC's neglect in managing its rights. Indeed, in a contemporaneously created e-mail dated over six months before this suit began, Gamache, the LLC's CFO wrote, "WAKE UP KEN!". *Stoll Aff.*, Ex. C. He went on to write to Nussbaum and Cohen, "Sorry I put blinders on and ignored Connection Group/Beacon Hill and have screwed the Signature managers." *Stoll Aff.*, Ex. C.

[9] Drooker denies that Beacon Hill is "wholly owned" by him.

### 3. The Transaction Was Fair and Reasonable at the Time it Was Authorized

Plaintiffs' Complaint does not attack the fairness or reasonableness of the Company's provision of back office services at the time it was authorized.[10] What Plaintiffs complain of, is that Beacon Hill grew at an unexpected rate, and accordingly, the volume of work and expense required in or around 2003 surpassed the compensation paid. *Stoll Aff.*, Ex. A (Nussbaum Dep., p. 107:20-25; 108:1-16). Even the termination letter from the Company to Beacon Hill noted "growth" as the reason for Signature LLC's refusal to continue to provide services at the then existing contract rate. *Drooker Aff.,* Ex. 10. Most importantly, the MSA contained a 30 day termination provision, which permitted either to terminate the relationship upon short notice for any reason whatsoever. Finally, the parties actually modified the payment obligation of Beacon Hill at least once. *Drooker Aff.,* ¶ 31. In 2002, the monthly fee was increased from $3,000 to $4,000. *Drooker Aff.,* ¶ 31.

## IV.    COUNT III MUST BE DISMISSED AS MOOT

Generally, a case that has been rendered moot will be dismissed.[11] Mazer v. Orange County, 811 So.2d 857, 859 (Fla. App. 2002). A case is moot when it "no longer presents an actual controversy or when the issues have ceased to exist because they have been 'so fully resolved that a judicial determination can have no actual effect.'" Id.

In Count III of Plaintiffs' Complaint, Plaintiffs allege that Drooker "has refused to sign an operating agreement regarding Netis setting forth" supposed agreed upon terms and seeks a

---

[10] The Company received an increasing amount of compensation for those services with each passing year, despite the terms of the written Agreement signed on April 5, 2001 which provides for a payment of $3,000 per month. According to the Company's CFS's, Beacon Hill paid yearly fees of $15,000, $36,000, $42,000, and $75,826 for the years ending December 31, 2000, 2001, 2002, and 2003, respectively. *Drooker Aff.,* Ex. 7.
[11] Only three circumstances exists when a moot case will not be dismissed: (1) when the issues are of great public importance; 2) when the issues are likely to recur; and 3) when collateral legal consequences flow from the issues to be resolved that may affect the rights of the parties. Id.

declaratory judgment. *Drooker Aff.*, Ex. 3 (Compl., ¶¶ 46-53). The claims asserted by Plaintiffs in Count III are moot. *Drooker Aff.*, Ex. 13, Ex. 14.

Cohen has now sold the operating assets of Netis and the company is in the process of dissolving. Any and all dissolution provisions contained within the Netis draft operating agreements contain dissolution provisions in accordance with Florida law. *Drooker Aff.*, ¶37, Ex. 12. Accordingly, even if Plaintiffs' allegations in Count III are accepted, no bona fide controversy exists due to Netis' sale, and the Count must be dismissed as moot.[12]

## CONCLUSION

For the reasons stated above, Drooker respectfully requests that this Court grant summary judgment, (1) dismissing Cohen as a party with respect to Counts I and II of Plaintiffs' Complaint, (2) dismissing all claims brought in Counts I and II for lack of subject matter jurisdiction; (3) dismiss Count II for failure to establish an essential element of the claimed breach of fiduciary duty for purported self-interested transactions; and (4) dismiss Count III as moot. A proposed form of order is attached.

Respectfully submitted,

EDWARD H. ZEBERSKY, ESQ.
FLA. BAR #: 908370

ZEBERSKY & PAYNE, LLP
Co-Counsel for the Defendant
4000 Hollywood Blvd., Ste. 400 North
Hollywood, FL 33021
Telephone: (954) 989-6333
Facsimile: (954) 989-7781
e-mail: tpayne@zpklaw.com

---

[12] In addition, it was Cohen, not Drooker, who through counsel, stated that he wished to stop any further work on finalizing Netis' Operating Agreement. A true and accurate copy of a letter disclosing this wish is attached to the *Drooker Aff.* as Ex. 13.

and

James W. Stoll, Esq.
Erika M. Holmes, Esq.
Co-counsel for the Defendant
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617 856-8201
e-mail:  jstoll@brbilaw.com

## CERTIFICATE OF SERVICE

I HEREBY certify that a true and accurate copy of the foregoing was sent via US Mail to:

Larry Stumpf, Esq., Attorney for Plaintiffs, Black, Srebnick, Kornspan & Stumpf, P.A., 201 S.

Biscayne Boulevard, Suite 300, Miami, Florida 33131 this 20th day of September, 2004.

EDWARD H. ZEBERSKY, ESQ.
FLA. BAR #: 908370

21

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Ft. Lauderdale Division

CASE NO. 04-60464-CIV TORRES/ Dimitrouleas
(Consent Case)

SIGNATURE CONSULTANTS, INC.,
and JAY L. COHEN,

      Plaintiffs,

v.

STEVEN DROOKER,

      Defendant.

_____/

STEVEN DROOKER,

      Counter-Plaintiff,

v.

SIGNATURE CONSULTANTS, INC.,
and JAY L. COHEN,

      Counter-Defendants.

_____/

## <u>NOTICE OF ISSUANCE OF THIRD-PARTY SUBPOENA</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

      Please take notice that the Plaintiffs, Signature Consultants, Inc., and Jay L. Cohen, in the

above-captioned matter, by their attorneys, have issued a third-party subpoena upon the Keeper

of the Records, Beacon Hill Staffing Group, LLC, as provided by the Federal Rules of Civil

Procedure.

      A copy of the subpoena is attached to this notice.

*Signature Consultants Inc. v. Drooker*
Case No. 04-60464-CIV-TORRES/Dimitrouleas

Respectfully Submitted,

Black, Srebnick, Kornspan & Stumpf, P.A.
*Attorneys for Signature Consultants, Inc.,*
*and Jay L. Cohen*
201 S. Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Tel: (305) 371-6421
Fax: (305) 371-6322

By _____
Larry A. Stumpf, Esq.
Aaron Anthon, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above *Notice of Issuance of Third-Party Subpoena* was sent via U.S. Mail this 11th day of November, 2004 to: **James W. Stoll, Esq.**, Brown Rudnick Berlack Israels LLP, One Financial Center, Boston, Massachusetts 02111 and **Todd S. Payne, Esq.**, Zebersky & Payne, LLP, 4000 Hollywood Blvd., Suite 400 North, Hollywood, Florida 33021.

By _____
Nicholas J. Walsh, Esq.
Dwyer & Collora, LLP
Boston, Massachusetts

AO88 (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                              DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

**IN HAND**       **COURTNEY GEORGE**       **RETURN OF SERVICE** (3)

| RECEIVED BY SERVER | DATE  November 11, 2004 | PLACE  Boston, Massachusetts |
|---|---|---|
| SERVED | DATE  November 11, 2004 | PLACE  152 BOWDOIN STREET, BOSTON          , Massachusetts |

| SERVED ON (NAME)  COURTNEY GEORGE, ASSISTANT OFFICE MANAGER AND DULY AUTHORIZED AGENT | FEES TENDERED  ☐ YES   ☒ NO AMOUNT $ _____  ☐ Advanced By Attorney |
|---|---|
| SERVED BY  BURTON M. MALKOFSKY | TITLE  Process Server and a Disinterested Person |

## STATEMENT OF SERVICE FEES

| SERVICE FEE | | TOTAL |
|---|---|---|
| $ ___25.00___   ___2___ Trips | | $ ___25.00___ |

## DECLARATION OF SERVER (4)

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____November 11, 2004_____
                             **Date**

_Burton M. Malkofsky_
**Signature of Server**

One Devonshire Place, Boston, Massachusetts
**Address of Server**

ADDITIONAL INFORMATION
     PLEASE NOTE THAT IT WAS NECESSARY TO MAKE___2___ATTEMPTS BEFORE MAKING PROPER SERVICE.

| Date | Time | Remarks | FEE |
|---|---|---|---|
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | TOTAL | $ _____ |

(3) As to who may serve a subpoena and the manner of its service see Rule 17(d), Federal Rules of Criminal Procedure, or Rule 45(c), Federal Rules of Civil Procedure.
(4) "fees and mileage need not be tendered to the deponent upon service of a subpoena issued on behalf of the United States or an officer or agency thereof (Rule 45(c), Federal Rules of Civil Procedure; Rule 17(d), Federal Rules of Criminal Procedure) or on behalf of certain indigent parties and criminal defendants who are unable to pay such costs (28 USC 1825, Rule 17(b) Federal Rules of Criminal Procedure)"

**Suvalle, Jodrey & Associates**       **One Devonshire Place**       Telephone # (617) 720-5733
**Massachusetts Constables since 1925**       **Boston, MA 02109**       Fax #       (617) 720-5737

## SCHEDULE A

These requests seek the production of documents generated, and/or referring to events that occurred, between January 1, 2000 and the present:

1. Any and all documents that refer to, relate to and/or reflect any expense reports submitted by Steven Drooker ("Drooker") to Connection Group LLC and/or Beacon Hill Staffing Group, LLC (collectively, "Beacon Hill").

2. Any and all documents that refer to, relate to and/or reflect any expense reimbursements to Drooker from Beacon Hill.

3. Any and all documents that refer to, relate to and/or reflect all payments to Drooker from Beacon Hill.

4. Any and all documents that refer to, relate to and/or reflect all loans to, capital contributions to, and/or capitalization of, Beacon Hill.

5. Any and all financial statements of Beacon Hill, including but not limited to balance sheets, income statements, profit and loss statements and/or statements of cash flows.

6. Any and all documents that refer to, relate to and/or reflect the organizational structure and employees of Beacon Hill, including but not limited to organizational charts and employee lists.

7. Any and all documents that reflect the identity of clients, potential or actual, of Beacon Hill in the finance and accounting staffing field.

8. Any and all documents that refer to and/or reflect candidates for employment at Beacon Hill, including but not limited to documents relating to recruitment of, and interviews with, potential employees, lists of potential employees and similar documents.

9. Any and all documents that refer to, relate to and/or reflect the recruitment and/or hiring of Jay Turner by Beacon Hill.

10. Any and all documents that refer to, relate to and/or reflect the recruitment and/or hiring of Peter Gentile by Beacon Hill.

11. Any and all documents that refer to, relate to and/or reflect the recruitment and/or hiring of Andrew Wang by Beacon Hill.

12. Any and all documents that refer to, relate to and/or reflect the retention by Beacon Hill of any law firms, attorneys and/or other legal counsel for any matter. (This request is NOT meant to require the production of documents protected by the attorney-client privilege.)

13. Any and all documents that refer to, relate to and/or reflect the ownership interest of individuals and/or entities in Beacon Hill.

14. Any and all documents that refer to, relate to and/or reflect those individuals and/or entities that have been members of Beacon Hill and the time period during which they were members.

15. Any and all documents that refer to, relate to and/or reflect those individuals and/or entities that have been managers of Beacon Hill and the time period during which they were managers.

16. Any and all documents that refer to, relate to and/or reflect those individuals and/or entities that have been officers of Beacon Hill and the time period during which they were officers.

17. Any and all documents that refer to, relate to and/or reflect those individuals and/or entities that have been directors of Beacon Hill and the time period during which they were directors.

18. Any and all documents that refer to, relate to and/or reflect those individuals and/or entities that have been shareholders of Beacon Hill and the time period during which they were shareholders.

19. Any and all documents that refer to, relate to and/or reflect Drooker's ownership interest and/or management role in Beacon Hill, including any documents relating to any change in any such interest or role of Drooker.

20. Any and all documents that refer to, relate to and/or reflect the identity of any action in which Beacon Hill has been a defendant. (This request is NOT meant to require the production of pleadings, discovery material or similar documents in the actions identified.)

21. Any and all documents that refer to, relate to and/or reflect any debt instrument to which Beacon Hill has been a party, and any guaranty of Beacon Hill's obligations thereunder.

22. Any and all documents that refer to, relate to and/or reflect the terms of any lease for space occupied by Beacon Hill.

23. Any and all documents that reflect the states, cities and/or locations where staffing placements have been made by Beacon Hill in the finance and accounting field.

24. Any and all documents that refer to, relate to and/or reflect telephone calls between Beacon Hill and Drooker, including phone records.

25. Any and all documents that refer to, relate to and/or reflect any communication between Beacon Hill and Drooker.

26. Any and all documents that refer to, relate to and/or reflect any agreements between Beacon Hill and Signature Consultants, LLC.

27. Any and all documents that refer to, relate to and/or reflect the servicing agreement entered into between Beacon Hill and Signature Consultants, LLC in or around April 2001.

28. Any and all documents that reflect communications between Beacon Hill and Signature Consultants, LLC.

29. Any and all documents that refer to, relate to and/or reflect the formation, management, staffing and financial operating results of Beacon Hill Financial, identified on Beacon Hill's website as "Beacon Hill Staffing Group's financial specialty division."

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Ft. Lauderdale Division

CASE NO. 04-60464-CIV TORRES/ Dimitrouleas
(Consent Case)

SIGNATURE CONSULTANTS, INC.,
and JAY L. COHEN,

      Plaintiffs,

v.

STEVEN DROOKER,

      Defendant.

_____/

STEVEN DROOKER,

      Counter-Plaintiff,

v.

SIGNATURE CONSULTANTS, INC.,
and JAY L. COHEN,

      Counter-Defendants.

_____/

## NOTICE OF DEPOSITION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on Wednesday, December 15, 2004, at 10:00 a.m., at the offices of Dwyer & Collora, LLP, 600 Atlantic Avenue, Boston, Massachusetts, 02210, representing the Plaintiffs, Signature Consultants, Inc., and Jay L. Cohen, in the above-captioned matter, by their attorneys, will depose Andrew Wang, 152 Bowdoin Street, Boston, MA 02108, upon oral examination as provided by the Federal Rules of Civil Procedure.

1

*Signature Consultants Inc. v. Drooker*
Case No. 04-60464-CIV-TORRES/Dimitrouleas

The deposition will be taken before a court reporter or other officer authorized to take depositions. The deposition may be used for discovery, at the trial of this action, or for any other purposes permitted by the Federal Rules of Civil Procedure. The deposition will continue from day to day until completed.

You are invited to attend and cross-examine.

Respectfully Submitted,

Black, Srebnick, Kornspan & Stumpf, P.A.
*Attorneys for Signature Consultants, Inc.,*
*and Jay L. Cohen,*
201 S. Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Tel: (305) 371-6421
Fax: (305) 371-6322

By _____
Larry A. Stumpf, Esq.
Aaron Anthon, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above *Notice of Deposition* and the accompanying *Subpoena* was sent via U.S. Mail this 11th day of November, 2004 to: **James W. Stoll, Esq.,** Brown Rudnick Berlack Israels LLP, One Financial Center, Boston, Massachusetts 02111 and **Todd S. Payne, Esq.,** Zebersky & Payne, LLP, 4000 Hollywood Blvd., Suite 400 North, Hollywood, Florida 33021.

By _____
Nicholas J. Walsh, Esq.
Dwyer & Collora, LLP
Boston, Massachusetts

2

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF _____ Massachusetts

Signature Consultants, Inc., et. al.

V.

Steven Drooker

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] S.D. Fla. 04-60464-CIV-TORRES

TO:   Andrew Wang
      152 Bowdoin Street
      Boston, MA 02108

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Dwyer & Collora, LLP, 600 Atlantic Avenue, Boston, MA 02210 | DATE AND TIME 12/15/2004 10:00 am |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A attached hereto.

| PLACE   Dwyer & Collora, LLP, 600 Atlantic Avenue, Boston, MA 02210 | DATE AND TIME 12/13/2004 10:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)    Local Counsel for Plaintiffs | DATE 11/11/2004 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Nicholas J. Walsh, Dwyer & Collora, LLP, 600 Atlantic Avenue, Boston, MA 02210   617-371-1000

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                          DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

## SCHEDULE A

These requests seek the production of documents generated, and/or referring to events that occurred, between January 1, 2000 and the present:

1.  Any and all documents that refer to, relate to and/or reflect any expense reports submitted by Steven Drooker ("Drooker") to Connection Group LLC and/or Beacon Hill Staffing Group, LLC (collectively, "Beacon Hill").

2.  Any and all documents that refer to, relate to and/or reflect any expense reimbursements to Drooker from Beacon Hill.

3.  Any and all documents that refer to, relate to and/or reflect all payments to Drooker from Beacon Hill.

4.  Any and all documents that refer to, relate to and/or reflect all loans to, capital contributions to, and/or capitalization of, Beacon Hill.

5.  Any and all financial statements of Beacon Hill, including but not limited to balance sheets, income statements, profit and loss statements and/or statements of cash flows.

6.  Any and all documents that refer to, relate to and/or reflect the organizational structure and employees of Beacon Hill, including but not limited to organizational charts and employee lists.

7.  Any and all documents that reflect the identity of clients, potential or actual, of Beacon Hill in the finance and accounting staffing field.

8.  Any and all documents that refer to and/or reflect candidates for employment at Beacon Hill, including but not limited to documents relating to recruitment of, and interviews with, potential employees, lists of potential employees and similar documents.

9.  Any and all documents that refer to, relate to and/or reflect the recruitment and/or hiring of Jay Turner by Beacon Hill.

10. Any and all documents that refer to, relate to and/or reflect the recruitment and/or hiring of Peter Gentile by Beacon Hill.

11. Any and all documents that refer to, relate to and/or reflect the recruitment and/or hiring of Andrew Wang by Beacon Hill.

12. Any and all documents that refer to, relate to and/or reflect the retention by Beacon Hill of any law firms, attorneys and/or other legal counsel for any matter. (This request is NOT meant to require the production of documents protected by the attorney-client privilege.).

13. Any and all documents that refer to, relate to and/or reflect the ownership interest of individuals and/or entities in Beacon Hill.

14. Any and all documents that refer to, relate to and/or reflect those individuals and/or entities that have been members of Beacon Hill and the time period during which they were members.

15. Any and all documents that refer to, relate to and/or reflect those individuals and/or entities that have been managers of Beacon Hill and the time period during which they were managers.

16. Any and all documents that refer to, relate to and/or reflect those individuals and/or entities that have been officers of Beacon Hill and the time period during which they were officers.

17. Any and all documents that refer to, relate to and/or reflect those individuals and/or entities that have been directors of Beacon Hill and the time period during which they were directors.

18. Any and all documents that refer to, relate to and/or reflect those individuals and/or entities that have been shareholders of Beacon Hill and the time period during which they were shareholders.

19. Any and all documents that refer to, relate to and/or reflect Drooker's ownership interest and/or management role in Beacon Hill, including any documents relating to any change in any such interest or role of Drooker.

20. Any and all documents that refer to, relate to and/or reflect the identity of any action in which Beacon Hill has been a defendant. (This request is NOT meant to require the production of pleadings, discovery material or similar documents in the actions identified.)

21. Any and all documents that refer to, relate to and/or reflect any debt instrument to which Beacon Hill has been a party, and any guaranty of Beacon Hill's obligations thereunder.

22. Any and all documents that refer to, relate to and/or reflect the terms of any lease for space occupied by Beacon Hill.

23. Any and all documents that reflect the states, cities and/or locations where staffing placements have been made by Beacon Hill in the finance and accounting field.

24. Any and all documents that refer to, relate to and/or reflect telephone calls between Beacon Hill and Drooker, including phone records.

25. Any and all documents that refer to, relate to and/or reflect any communication between Beacon Hill and Drooker.

**IN HAND** ANDREW WANG **RETURN OF SERVICE** (3)

| RECEIVED BY SERVER | DATE November 11, 2004 | PLACE Boston, Massachusetts |
|---|---|---|

| SERVED | DATE November 11, 2004 | PLACE 152 BOWDOIN STREET, BOSTON , Massachusetts |
|---|---|---|

| SERVED ON (NAME) ANDREW WANG | FEES TENDERED ☒ YES ☐ NO AMOUNT $ 42.00  ☐ Advanced By Attorney |
|---|---|

| SERVED BY BURTON M. MALKOFSKY | TITLE Process Server and a Disinterested Person |
|---|---|

## STATEMENT OF SERVICE FEES

| SERVICE FEE | | TOTAL |
|---|---|---|
| $ 75.00 | 2 Trips | $ 117.00 |

## DECLARATION OF SERVER (4)

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____ November 11, 2004 _____
Date

_Signature of Server_ Burton M. Malkofsky

One Devonshire Place, Boston, Massachusetts
_Address of Server_

---

**ADDITIONAL INFORMATION**
PLEASE NOTE THAT IT WAS NECESSARY TO MAKE __2__ ATTEMPTS BEFORE MAKING PROPER SERVICE.

| Date | Time | Remarks | FEE |
|---|---|---|---|

PLEASE NOTE PROCESS SERVER HAD TO WAIT 30 MINUTES (3:10-3:40P.M.)  IN ORDER TO MAKE     $ _____

IN HAND SERVICE...   TRIP - $ 50.00    WAIT - $ 25.00          TOTAL - $ 75.00   $ _____

$ _____

$ _____

$ _____

$ _____

TOTAL   $ _____

(3) As to who may serve a subpoena and the manner of its service see Rule 17(d), Federal Rules of Criminal Procedure, of Rule 45(c), Federal Rules of Civil Procedure.
(4) "fees and mileage need not be tendered to the deponent upon service of a subpoena issued on behalf of the United States or an officer or agency thereof (Rule 45(c), Federal Rules of Civil Procedure; Rule 17(d), Federal Rules of Criminal Procedure) or on behalf of certain indigent parties and criminal defendants who are unable to pay such costs (28 USC 1825, Rule 17(b) Federal Rules of Criminal Procedure)"

**Suvalle, Jodrey & Associates**          **One Devonshire Place**          Telephone # (617) 720-5733
**Massachusetts Constables since 1925**      **Boston, MA 02109**           Fax #      (617) 720-5737

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
Ft. Lauderdale Division

CASE NO. 04-60464 –CIV- TORRES/Dimitrouleas
(Consent Case)

SIGNATURE CONSULTANTS, INC.
AND JAY L. COHEN,

     Plaintiffs,

v.

STEVEN DROOKER,

     Defendant,

_____/

STEVEN DROOKER,

     Plaintiff-in-Counterclaim,

v.

SIGNATURE CONSULTANTS, INC.
AND JAY L. COHEN,

     Defendants-in-Counterclaim.

_____/

## RULE 45(c)(2)(B) OBJECTION OF BEACON HILL STAFFING GROUP, LLC AND ANDREW WANG

In accordance with the provisions of Federal Rule of Civil Procedure Rule 45(c)(2)(B), third party witnesses Beacon Hill Staffing Group, LLC ("Beacon Hill") and Andrew Wang ("Wang") object to the subpoena duces tecum served upon them by Signature Consultants, Inc. and Jay L. Cohen. In support of this motion, Beacon Hill and Wang state as follows:

1.     On November 11, 2004, Signature Consultants, Inc. and Jay L. Cohen, served Beacon Hill with a Keeper of the Records subpoena duces tecum in connection with an action pending in the United States District Court for the Southern District of Florida (Fort Lauderdale

Division) entitled Signature Consultants, Inc. and Jay L. Cohen v. Steven Drooker, Civil Action

No. 04-60464-CIV TORRES/Dimitrouleas.

2.    The subpoena duces tecum addressed to the "Keeper of the Records" of Beacon

Hill contains a Schedule A that demands 29 separate categories of documents be produced.

3.    Also on November 11, 2004, Signature Consultants and Jay Cohen served a

subpoena on Andrew Wang, Beacon Hill's Chief Executive Officer. That subpoena demands Mr.

Wang attend a deposition on December 15, 2004, and includes the identical list of 29 categories

of documents to be brought with him.

4.    Beacon Hill and Wang object to the subpoena on the grounds that the information

sought is in certain instances irrelevant to the litigation pending in Florida, and other instances

calls for confidential and proprietary information, and is generally overbroad and burdensome.

For example, Request 24 asks for all telephone records and any other documents referring to

telephone calls between anyone at Beacon Hill and Mr. Drooker. Request No. 25 demands all

documents that reflect any communication between anyone at Beacon Hill and Mr. Drooker.

Request No. 28 requests any documents that reflect any communications between anyone at

Beacon Hill and anyone at Signature Consultants LLC. The time frame for the proposed

requests is January 1, 2000 to the present. This request requires these non-parties to go through

every telephone record, e-mail, and any other document over a four year period which in any

way could possibly refer or relate to any communication whatsoever. Such a request is patently

overbroad, burdensome and intended to harass these non-parties. Moreover, there is no obvious

relevance that can be gleaned from this request.

5.     Another example of the irrelevant and harassing nature of the subpoena is Request 20 which demands any and all documents that refer to, relate to or reflect the identity of any action in which Beacon Hill has been a defendant.

6.     With respect to inappropriately demanded proprietary information, Request 21 demands all documents that reflect any debt instruments in which Beacon Hill has been a party and any guarantor of such debt instruments. Request No. 22 demands to know Beacon Hill's commercial relationship with its landlord of its leasehold for its office space. Request No. 7 demands production of documents that reflect the identity of actual and potential clients of Beacon Hill. Request No. 8 demands documents that reflect all recruitment of employees, all interviews with employees and all lists of potential employees. Finally, Request No. 12 demands documents that relate to the retention of any law firms by Beacon Hill. Moreover, each of these requests is irrelevant to the litigation.

7.     In short, the third-party subpoenas to the Keeper of the Records of Beacon Hill and to Andrew Wang are patently improper and objectionable on the grounds that they are overbroad and burdensome, seek irrelevant information and inappropriately demand proprietary information.

Respectfully Submitted,

By: _____

James W. Stoll, Esq.
Erika M. Holmes, Esq.
BROWN RUDNICK BERLACK ISRAELS LLP
1 Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201
*Attorneys for Defendants Beacon Hill Staffing Group LLC and Andrew Wang*

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the within Rule 45(c)(2)(B) Objection Of Beacon

Hill Staffing Group, LLC and Andrew Wang was sent via U.S. Mail this 23rd day of November

2004 to Larry A. Stumpf, Esq., Black, Srebnick, Kornspan & Stumpf, 201 S. Biscayne

Boulevard, Suite 1300, Miami, Florida 33131.


James W. Stoll

#1314330 v1 - stoljjwD - 55601!.docD - 18009/8

4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SIGNATURE CONSULTANTS, INC., and JAY L. COHEN, <br><br> Plaintiffs, <br> v. <br><br> STEVEN DROOKER, <br><br> Defendant. <br><br> STEVEN DROOKER, <br><br> Counter-Plaintiff, <br> v. <br><br> SIGNATURE CONSULTANTS, INC., and JAY L. COHEN, <br><br> Counter-Defendants. | MBD No. _____ |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION TO COMPEL DOCUMENT PRODUCTION
## BY BEACON HILL STAFFING GROUP, LLC, AND ANDREW WANG

Pursuant to Fed. R. Civ. P. 45(c)(2)(B), Plaintiffs Signature Consultants, Inc., and Jay L.

Cohen (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in Support of the

Plaintiffs' Motion to Compel Production. Plaintiffs seek an order compelling third-party

witnesses Beacon Hill Staffing Group, LLC ("Beacon Hill") and Andrew Wang ("Wang"),

Beacon Hill's Executive Officer, to produce all documents required under the subpoena duces

tecum of November 11, 2004, served in connection with litigation in the Southern District of

Florida between Plaintiffs and Defendant Steven Drooker ("Drooker").[1]  *See* Complaint attached

as Exhibit A; Subpoena to Beacon Hill attached as Exhibit B; Subpoena to Wang attached as

Exhibit C.  Beacon Hill and Wang have served objections to items 7-8, 12, 20-22, 24-25, and 28

of that subpoena duces tecum.  *See* Objection attached as Exhibit D.  Beacon Hill and Wang are

both residents of Massachusetts.[2]

Attempts by Plaintiffs' counsel to resolve this issue with James W. Stoll, Esq., attorney

for Beacon Hill and Wang, have been unsuccessful.  For the reasons set forth below, Plaintiffs

respectfully request that this Honorable Court enter an order compelling Beacon Hill and Wang

to produce the documents required in items 7-8, 12, 21-22, and 24-25 of that subpoena duces

tecum.[3]


## ARGUMENT

In a jointly filed Rule 45(c)(2)(B) Objection, Beacon Hill and Wang refused to produce

the documents required in items 7-8, 12, 20-22, 24-25, and 28 of that subpoena duces tecum

alleging that some of the information is "irrelevant," some is "proprietary," and that some

requests are "generally overbroad and burdensome."  Exhibit D at 2.  On the contrary, this

information is extremely relevant, and is neither overbroad nor burdensome.  To the extent the

---

[1] Signature Consultants, Inc. v. Drooker, Case No. 04-60464-CIV (S.D. Fla.).  Plaintiffs filed a Motion to Amend the Complaint and First Amended Complaint on December 9, 2004.  The First Amended Complaint would not alter the Complaint in any way relevant to the issues raised in this Motion to Compel Production.

[2] Under Fed. R. Civ. P. 45(c)(2)(B), an order compelling production pursuant to a subpoena duces tecum must be issued by "the court by which the subpoena was issued."  The subpoena duces tecum at issue here was issued by this Honorable Court pursuant to Fed. R. Civ. P. 45(a)(2):  "If separate from a subpoena commanding the attendance of a person, a subpoena for production or inspection shall issue from the court for the district in which the production or inspection is to be made."

[3] In the interests of resolving this matter, Plaintiffs agree to withdraw their request for the documents requested in items 20 and 28 of the subpoena duces tecum.

subpoena duces tecum requests information that may properly be considered "proprietary," Plaintiffs have no objection to entering into a normal confidentiality agreement.

## Background

The underlying action in the Southern District of Florida was filed by Jay L. Cohen, as manager of and for the benefit of Signature Consultants, LLC ("Signature LLC"), and the corporation wholly owned and controlled by him, Signature Inc. The Complaint seeks to recover the substantial losses sustained by reason of the breaches by Drooker, the other named manager of Signature LLC, of his duties of loyalty and other duties owed to Signature LLC and to Signature Inc. with respect to the conduct of the business of Signature LLC. Signature LLC is a Florida limited liability company that is in the business of short-term and permanent placement of personnel, primarily in the information technology and finance and accounting ("F&A") fields.

The gravamen of Plaintiffs' Complaint is that Defendant Drooker, a managing-member of Signature LLC, has breached his fiduciary and other duties to Signature LLC by engaging in acts that constitute conflicts of interest. *See* Complaint, ¶ 1. This included using another company, Beacon Hill, owned and managed by Drooker, to actively compete with Signature LLC, *see* Complaint, ¶¶ 14-23, 38-40; causing Signature LLC to enter a contract with Beacon Hill to provide administrative services to Beacon Hill at below fair market value, *see* Complaint, ¶¶ 24, 43-45; and funneling prospective employees to Beacon Hill, instead of Signature LLC, as well as actively luring both present and potential employees away from Signature LLC and to Beacon Hill, *see* Complaint, ¶¶ 18-21, 23.

-3-

## Analysis

Item 7 requests "Any and all documents that reflect the identity of clients, potential or actual, of Beacon Hill in the finance and accounting staffing field." Beacon Hill and Wang claim that this information is irrelevant. However, this information is not only relevant, it is central to the claims against Drooker. The Complaint alleges that Drooker breached his fiduciary duties to Signature LLC by using Beacon Hill to actively compete against Signature LLC in the field of F&A personnel placement. To prove that claim, Plaintiffs must show that Beacon Hill was in fact competing against Signature LLC. The identity of Beacon Hill's actual F & A clients, and the identity of those solicited by Beacon Hill, is not simply relevant, it is crucial.

Item 8 asks for "Any and all documents that refer to and/or reflect candidates for employment at Beacon Hill, including, but not limited to documents relating to recruitment of, and interviews with, potential employees, lists of potential employees, and similar documents." Again, Beacon Hill and Wang claim that this information is irrelevant. However, again this information is directly relevant to the allegations against Drooker in the Complaint. The Complaint expressly alleges that Drooker funneled prospective employees of Signature LLC to Beacon Hill, instead of Signature LLC, and actively lured both present and potential employees away from Signature LLC and to Beacon Hill. *See* Complaint, ¶¶ 18-21, 23. A list of actual and potential employees is information that goes to the very heart of the claims against Drooker.

Item 12 asks for "Any and all documents that refer to, relate to and/or reflect the retention by Beacon Hill of any law firms, attorneys and/or other legal counsel for any matter." Beacon Hill and Wang also claim that this information is irrelevant. On the contrary, this information is extremely relevant to the claims against Drooker. If, in fact, the same attorneys and law firms represented Signature LLC, Drooker, and Drooker's company, Beacon Hill, it is more probable

-4-

that Drooker acted with a conflict of interest with regard to Beacon Hill and Signature LLC's contract with Beacon Hill, to the detriment of Signature LLC. *See* Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence."). It also tends to prove that Drooker engaged that same attorney to represent both sides in furtherance of that scheme.

Item 21 asks for "Any and all documents that refer to, relate to and/or reflect any debt instrument to which Beacon Hill has been a party, and any guaranty of Beacon Hill's obligations thereunder." Central to Plaintiffs' claims against Drooker is the relationship between Drooker and Beacon Hill – either directly or through his wife. Drooker has denied his interest and/or participation in Beacon Hill. *See* Affidavit of Steven Drooker in Support of Defendant's Motion for Summary Judgment at 4, attached as Exhibit E. Any information that Drooker or his wife signed or guaranteed any debt instrument on behalf of Beacon Hill would make it more probable that Drooker had a significant interest and/or involvement with Beacon Hill, and is therefore highly relevant. *See* Fed. R. Evid. 401.

Item 22 asks for "Any and all documents that refer to, relate to and/or reflect the terms of any lease for space occupied by Beacon Hill." As with Beacon Hill debt information, if Drooker or his wife signed any lease on behalf of Beacon Hill, that would make it more probable that Drooker had a significant interest and/or involvement with Beacon Hill. Moreover, the Complaint also alleges that Drooker caused Signature LLC to enter into a lease for office space with the landlord being another company in which Drooker himself owned an interest, and that the terms of which lease were very unfavorable to Signature LLC and very favorable to Drooker. *See* Complaint, ¶25. If, in fact, a similar situation exists with Beacon Hill, it would make it more

-5-

probable that Drooker intentionally put Signature LLC into its lease with a Drooker-controlled

trust to benefit himself, to the financial detriment of the LLC, as alleged in the Complaint.  Thus,

again, this information is highly relevant to whether Drooker breached his fiduciary duties to

Signature LLC.

Item 24 asks for "Any and all documents that refer to, relate to and/or reflect telephone

calls between Beacon Hill and Drooker, including phone records."  Item 25 asks for "Any and all

documents that refer to, relate to and/or reflect any communication between Beacon Hill and

Drooker."  Beacon Hill and Wang claim these items are not only irrelevant but overbroad and

burdensome.  Again, this information is highly relevant to show the relationship between

Drooker and Beacon Hill.  Moreover, the claim that production of this information would be

overly burdensome stands in dramatic conflict with Drooker's sworn testimony that he had little

or nothing to do with the management or operation Beacon Hill.  *See* Exhibit E at 4.  If, in fact,

Drooker is not or has not been directly involved in the operation of Beacon Hill, the number of

documents which would need to be produced for items 24 and 25 should be minimal.  If,

however, Drooker is and has been, as alleged, actively and directly involved in the operation of

Beacon Hill, then this information is especially relevant and indeed goes to the heart of the

claims against Drooker.  It is precisely the quantity and quality of those communications that will

show Drooker's active involvement in Beacon Hill.

## CONCLUSION

Accordingly, for the reasons shown above, Plaintiffs Signature Consultants, Inc. and Jay L. Cohen respectfully request that this Honorable Court grant their motion and issue an order compelling Beacon Hill Staffing Group, LLC, and Andrew Wang to produce the documents required in items 7-8, 12, 21-22, and 24-25 of the subpoena duces tecum of November 11, 2004.

Dated: December 14, 2004

Respectfully Submitted,

SIGNATURE CONSULTANTS, INC.,
and JAY L. COHEN,

By their attorneys,

David A. Bunis (BBO #550570)
Nicholas J. Walsh (BBO #647702)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210
617-371-1000
617-371-1037 (f)

Larry A. Stumpf, Esq.
Aaron Anthon, Esq.
Black, Srebnick, Kornspan & Stumpf, P.A.
201 S. Biscayne Boulevard, Suite 1300
Miami, Florida 33131
305-371-6421
305-371-6322 (f)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the *Memorandum Of Law In Support Of Plaintiffs' Motion To Compel Document Production By Beacon Hill Staffing Group, LLC, And Andrew Wang* was sent via Hand Delivery this 14th day of December, 2004 to **James W. Stoll, Esq.**, Brown Rudnick Berlack Israels LLP, One Financial Center, Boston, Massachusetts 02111, and by First Class Mail, postage prepaid, to **Todd S. Payne, Esq.**, Zebersky & Payne, LLP, 4000 Hollywood Blvd., Suite 400 North, Hollywood, Florida 33021.

Nicholas J. Walsh

UNITED STATES DISTRICT COURT
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.  04-60464 –CIV- TORRES/Dimitrouleas
(Consent Case)

SIGNATURE CONSULTANTS, INC.
AND JAY L. COHEN,

      Plaintiffs,

v.

STEVEN DROOKER,

      . Defendant,

_____/

STEVEN DROOKER,

      Plaintiff-in-Counterclaim,

v.

SIGNATURE CONSULTANTS, INC.
AND JAY L. COHEN,

      Defendants-in-Counterclaim.

_____/

## DEFENDANT STEVEN DROOKER'S ANSWERS TO
## PLAINTIFFS' REQUEST FOR ADMISSIONS

In accordance with Rule 36 of the Federal Rules of Civil Procedure, the defendant,

Steven Drooker, answers the Requests for Admissions propounded by Plaintiffs as follows:

1.     Drooker is a manger of Signature, LLC.

**Response:**    Admit

2.     Drooker was a manger of Signature, LLC in 2000.

**Response:**    Admit

3.    Drooker was a manger of Signature, LLC in 2001.

**Response:**    Admit

4.    Drooker was a manger of Signature, LLC in 2002.

**Response:**    Admit

5.    Drooker was a manger of Signature, LLC in 2003.

**Response:**    Admit

6.    Drooker was a manger of Signature, LLC at the time that this action was filed.

**Response:**    Admit

7.    Drooker has been a manger of Signature LLC continuously since the formation of Signature LLC in 1997.

**Response:**    Admit

8.    Drooker has been one of two managers of Signature LLC continuously since the formation of Signature LLC in 1997.

**Response:**    Admit

9.    Connection Group was formed as a Massachusetts limited liability company in 2000.

**Response:**    Admit

2

10.    In April 2003, the name of Connection Group was changed in Beacon Hill.

**Response:**    Admit

11.    Beacon Hill is the successor in interest, by name change, to Connection Group.

**Response:**    Admit

12.    Drooker is a manager of Beacon Hill.

**Response:**    Denied

13.    Drooker is the sole manager of Beacon Hill.

**Response:**    Denied

14.    Drooker was a manager of Connection Group in 2000.

**Response:**    Admit

15.    Drooker was the sole manager of Connection Group in 2000.

**Response:**    Admit

16.    Drooker was a manager of Connection Group in 2001.

**Response:**    Admit

17.    Drooker was the sole manager of Connection Group in 2001.

**Response:**    Admit

18.    Drooker was a manager of Connection Group in 2002.

**Response:**    Admit

19.    Drooker was the sole manager of Connection Group in 2002.

**Response:**    Admit

20.     Drooker was a manager of Connection Group in 2003.

**Response:**     Admit

21.     Drooker was the sole manager of Connection Group in 2003.

**Response:**     Admit

22.     Drooker has been the sole manager of Connection Group/Beacon Hill since the time that Connection Group was formed.

**Response:**     Denied

23.     Drooker holds an equity interest in Beacon Hill.

**Response:**     Deny

24.     Drooker held an equity interest in Connection Group in 2000.

**Response:**     Admit

25.     Drooker held an equity interest in Connection Group in 2001.

**Response:**     Admit

26.     Drooker held an equity interest in Connection Group in 2002.

**Response:**     Admit

27.     Drooker held an equity interest in Connection Group in 2003.

**Response:**     Admit

28.     Drooker held an equity interest in Beacon Hill in 2003.

**Response:**     Admit

29.    Drooker held an equity interest in Beacon Hill at the time that this action was filed.

**Response:**    Admit

30.    Drooker has held an equity interest in Connection Group/Beacon Hill since the time that Connection Group was formed.

**Response:**    Denied

31.    Lee Drooker holds an equity interest in Beacon Hill.

**Response:**    Admit

32.    Lee Drooker held an equity interest in Connection Group in 2000.

**Response:**    Admit

33.    Lee Drooker held an equity interest in Connection Group in 2001.

**Response:**    Admit

34.    Lee Drooker held an equity interest in Connection Group in 2002.

**Response:**    Admit

35.    Lee Drooker held an equity interest in Connection Group in 2003.

**Response:**    Admit

36.    Lee Drooker held an equity interest in Beacon Hill in 2003.

**Response:**    Admit

37.    Lee Drooker held an equity interest in Beacon Hill at the time that this action was filed.

**Response:**    Admit

38.    Lee Drooker has held an equity interest in Connection Group/Beacon Hill since the time that Connection Group was formed.

**Response:**    Admit

39.    Levy performed legal services for Connection Group in 2001.

**Response:**    Objection.  The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

40.    Levy performed legal services for Connection Group in 2002.

**Response:**    Objection.  The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

41.    Levy performed legal services for Connection Group in 2003.

**Response:**    Objection.  The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

42.    Levy performed legal services for Beacon Hill in 2003.

**Response:**    Objection.  The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

43.    Levy performed legal services for Beacon Hill in 2004.

**Response:**    Objection.  The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

44.    Levy performed legal services for Wheeling Avenue Realty Trust in 2000.

**Response:**    Admit

45.    Levy performed legal services for Wheeling Avenue Realty Trust in 2001.

**Response:**    Admit

46.    Levy was the attorney for Wheeling Avenue Realty Trust in connection with the

lease between Wheeling Avenue Realty Trust and Signature LLC described in paragraph 25 of

the Complaint.

**Response:**    Admit

47.    Eckert Seamans performed legal services for Connection Group in 2000.

**Response:**    Objection. The defendant objects to this request on the grounds that the
information sought is irrelevant and not calculated to lead to the discovery of admissible
evidence.

48.    Eckert Seamans performed legal services for Connection Group in 2001.

**Response:**    Objection. The defendant objects to this request on the grounds that the
information sought is irrelevant and not calculated to lead to the discovery of admissible
evidence.

49.    Eckert Seamans performed legal services for Connection Group in 2002.

**Response:**    Objection. The defendant objects to this request on the grounds that the
information sought is irrelevant and not calculated to lead to the discovery of admissible
evidence.

50.    Eckert Seamans performed legal services for Connection Group in 2003.

**Response:**    Objection. The defendant objects to this request on the grounds that the
information sought is irrelevant and not calculated to lead to the discovery of admissible
evidence.

51.    Eckert Seamans performed legal services for Beacon Hill in 2003.

**Response:**     Objection. The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

52.     Eckert Seamans performed legal services for Beacon Hill in 2004.

**Response:**     Objection. The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

53.     Eckert Seamans performed legal services for Signature LLC in 2000.

**Response:**     Objection. The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

54.     Eckert Seamans performed legal services for Signature LLC 2001.

**Response:**     Objection. The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

55.     Eckert Seamans performed legal services for Signature LLC 2002.

**Response:**     Objection. The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

56.     Eckert Seamans performed legal services for Signature LLC 2003.

**Response:**     Objection. The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

57.     Eckert Seamans performed legal services for Signature LLC 2004.

**Response:**     Objection. The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

58.    Eckert Seamans performed legal services for Drooker in 2000.

**Response:**    Objection. The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

59.    Eckert Seamans performed legal services for Drooker in 2001.

**Response:**    Objection. The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

60.    Eckert Seamans performed legal services for Drooker in 2002.

**Response:**    Objection. The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

61.    Eckert Seamans performed legal services for Drooker in 2003.

**Response:**    Objection. The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

62.    Eckert Seamans performed legal services for Drooker in 2004.

**Response:**    Objection. The defendant objects to this request on the grounds that the information sought is irrelevant and not calculated to lead to the discovery of admissible evidence.

63.    Eckert Seamans performed legal services for Wheeling Avenue Realty Trust in

2000.

**Response:**    Admit

64.    Eckert Seamans performed legal services for Wheeling Avenue Realty Trust in

2001.

**Response:**    Admit

65.     Eckert Seamans represented Wheeling Avenue Realty Trust in connection with the lease described in paragraph 25 of the Complaint.

**Response:**     Admit

66.     Exhibit A (JC 739-748) attached hereto is a copy of the lease described in paragraph 25 of the Complaint.

**Response:**     Admit

67.     Drooker negotiated the terms of the lease described in paragraph 25 of the Complaint on behalf of Wheeling Avenue Realty Trust.

**Response:**     Denied

68.     Drooker participated in negotiating, on behalf of Wheeling Avenue Realty Trust, the terms of the lease described in paragraph 25 of the Complaint.

**Response:**     Admit

69.     Drooker has a financial interest in Wheeling Avenue Realty Trust.

**Response:**     Admit

70.     Drooker is the majority owner of Wheeling Avenue Realty Trust.

**Response:**     Denied

71.     Connection Group was in the F & A Business in 2000.

**Response:**     Denied

72.     Connection Group was in the F & A Business in 2001.

**Response:**     Denied

10

73.    Connection Group was in the F & A Business in 2002.

**Response:**    Denied

74.    Connection Group was in the F & A Business in 2003.

**Response:**    Denied

75.    Beacon Hill was in the F & A Business in 2003.

**Response:**    Admit

76.    Beacon Hill was in the F & A Business in 2004.

**Response:**    Admit

77.    Beacon Hill was in the F & A Business at the time that this action was filed.

**Response:**    Admit

78.    Beacon Hill is in the F & A Business.

**Response:**    Admit

79.    Beacon Hill has a financial division.

**Response:**    Admit

80.    Beacon Hill's financial division is under the day-to-day supervision of Wang.

**Response:**    Denied

81.    Beacon Hill's financial division operates in the areas of accounting and finance, banking and others.

**Response:**    Admitted as to accounting and finance and banking.  As to the balance of request, Drooker objects because the phrase "and others" is unintelligible.  Drooker does not know what the plaintiffs mean by "and others."

82.    Exhibit B (JC 361) attached hereto is a copy of a letter, dated July 14, 2003, from Beacon Hill to Gerald Burl regarding an offer of employment.

**Response:**    Admit

83.    Exhibit C (JC 362-366) attached hereto is a copy of an employment agreement, dated August 20, 2003, between Beacon Hill and Gerald Burl.

**Response:**    Admit

84.    Beacon Hill hired Gerald Burl to work in its financial division.

**Response:**    Admit

85.    Exhibit D (JC 367-369) attached hereto is a copy of a letter, dated July 14, 2003, from Beacon Hill to Amy Van Sicklin regarding an offer of employment.

**Response:**    Admit

86.    Exhibit E (JC 370-374) attached hereto is a copy an employment agreement, dated August 20, 2003, between Beacon Hill and Amy Van Sicklin.

**Response:**    Admit

87.    Beacon Hill hired Amy Van Sicklin to work in its financial division.

**Response:**    Admit

88.    Exhibit F (JC 381-387) attached hereto is a copy of a letter and employment agreement, dated September 10, 2003, between Beacon Hill and Jay Turner.

**Response:**    Admit

89.    Beacon Hill hired Jay Turner to work in its financial division.

**Response:**    Admit

90.    Exhibit G (JC 388-389; 391-395) attached hereto is a copy of a letter and employment agreement, dated September 3, 2003, between Beacon Hill and Ricky Grasso.

**Response:**    Admit

91.    Beacon Hill hired Ricky Grasso to work in its financial division.

**Response:**    Admit

92.    Exhibit H (JC 396) attached hereto is a copy of a letter, dated October 20, 2003, from Beacon Hill to Robin Chase regarding an offer of employment.

**Response:**    Admit

93.    Exhibit I (JC 397-401) attached hereto is a copy of an employment agreement, dated November 3, 2003, between Beacon Hill and Robin Chase.

**Response:**    Admit

94.    Beacon Hill hired Robin Chase to work in its financial division.

**Response:**    Admit

95.    Exhibit J (JC 402-407) attached hereto is a copy of a letter and employment agreement, dated October 20, 2003, between Beacon Hill and Patrick Roche.

**Response:**    Admit

96.    Beacon Hill hired Patrick Roche to work in its financial division.

**Response:**    Admit

97.    Exhibit K (JC 408) attached hereto is a copy of a letter, dated December 1, 2003,

from Beacon Hill to Patrick Murphy regarding an offer of employment.

**Response:**     Admit

98.     Exhibit L (JC 409-413) attached hereto is a copy of an employment agreement,

dated December 8, 2003, between Beacon Hill and Patrick Murphy.

**Response:**     Denied

99.     Beacon Hill hired Patrick Murphy to work in its financial division.

**Response:**     Denied

100.     Exhibit M (JC 414-415) attached hereto is a copy of a letter, dated August 13,

2003, from Beacon Hill to Jason Fine regarding an offer of employment.

**Response:**     Admit

101.     Exhibit N (JC 416-420) attached hereto is a copy of an employment agreement,

dated August 20, 2003, between Beacon Hill and Jason Fine.

**Response:**     Admit

102.     Beacon Hill hired Jason Fine to work in its financial division.

**Response:**     Admit

103.     Signature LLC was in the F & A Business in 1999.

**Response:**     Denied

104.     Signature LLC was in the F & A Business in 2000.

**Response:**     Denied

105.     Signature LLC was in the F & A Business in 2001.

14

**Response:**    Drooker objects on the grounds that the request as written implies that all of Signature LLC's offices were engaged in the business of placing personnel in the accounting and finance market, when only the Charlotte, N.C. office was so engaged.

106.    Signature LLC was in the F & A Business in 2002.

**Response:**    Drooker objects on the grounds that the request as written implies that all of Signature LLC's offices were engaged in the business of placing personnel in the accounting and finance market, when only the Charlotte, N.C. office was so engaged.

107.    Signature LLC was in the F & A Business in 2003.

**Response:**    Drooker objects on the grounds that the request as written implies that all of Signature LLC's offices were engaged in the business of placing personnel in the accounting and finance market, when only the Charlotte, N.C. office was so engaged.

108.    Signature LLC was in the F & A Business in 2004.

**Response:**    Drooker objects on the grounds that the request as written implies that all of Signature LLC's offices were engaged in the business of placing personnel in the accounting and finance market, when only the Charlotte, N.C. office was so engaged.

109.    Signature LLC was in the F & A Business at the time this action was filed.

**Response:**    Drooker objects on the grounds that the request as written implies that all of Signature LLC's offices were engaged in the business of placing personnel in the accounting and finance market, when only the Charlotte, N.C. office was so engaged.

110.    Signature LLC is in the F & A Business.

**Response:**    Drooker objects on the grounds that the request as written implies that all of Signature LLC's offices were engaged in the business of placing personnel in the accounting and finance market, when only the Charlotte, N.C. office was so engaged.

111.    Signature LLC considered hiring and/or pursued the possibility of hiring Ryan Murphy ("Murphy").

**Response:**    Based on his present memory, Drooker is unable to admit or deny this request.

112.    Signature LLC recruited Murphy to do F & A Business from Signature LLC's Massachusetts office.

**Response:**    Based on his present memory, Drooker is unable to admit or deny this request.

113.    Nussbaum informed Drooker of Signature LLC's efforts to recruit Murphy.

**Response:**    Based on his present memory, Drooker can neither admit or deny this request.

114.    Drooker knew of Signature LLC's interest in potentially hiring Murphy.

**Response:**    Based on his present memory, Drooker is unable to admit or deny this request.

115.    Drooker met with Murphy regarding Murphy's possible employment by Signature LLC.

**Response:**    Based on his present memory, Drooker can neither admit or deny this request.

116.    Drooker told Nussbaum not to hire Murphy for Signature LLC.

**Response:**    Denied

117.    Murphy was never hired by Signature LLC.

**Response:**    The Defendant is without information or knowledge sufficient to either admit or deny the request.

118.    Subsequent to being passed over for employment by Signature LLC, Murphy took a position at another Boston-based placement company that was engaged in the F & A Business.

**Response:**    Drooker is without information or knowledge sufficient to either admit or deny Request No. 118.

119.    Signature LLC considered hiring and/or pursued the possibility of hiring Mark Flaherty ("Flaherty").

**Response:**    Admit

120.    Signature LLC recruited Flaherty to do F & A Business from Signature LLC's Massachusetts office.

**Response:**    Admit

121.    Drooker knew of Signature LLC's interest in potentially hiring Flaherty.

**Response:**    Admit

122.    Drooker met with Flaherty regarding Flaherty's possible employment by Signature LLC.

**Response:**    Admit

123.    Drooker met with Flaherty and Nussbaum at Drooker's home in or about January 2003 regarding Flaherty's possible employment by Signature LLC.

**Response:**    Admit

124.    Drooker told Nussbaum not to hire Flaherty for Signature LLC.

**Response:**    Denied

125.    Flaherty was never hired by Signature LLC.

**Response:**    Admit

126.    Signature LLC considered hiring and/or pursued the possibility of hiring Jay Turner ("Turner").

**Response:**    Drooker lacks sufficient knowledge or information to either admit or deny this request.

127.    Signature LLC recruited Turner to do F & A Business from Signature LLC's Massachusetts office.

**Response:**    Drooker lacks sufficient knowledge or information to either admit or deny this request.

128.    Drooker knew of Signature LLC's interest in potentially hiring Turner.

**Response:**    Denied

129.    Drooker met with Turner regarding Turner's possible employment by Signature LLC.

**Response:**    Denied

130.    Drooker told Nussbaum not to hire Turner for Signature LLC.

**Response:**    Denied

131.    Drooker told Nussbaum that Turner was incompetent.

**Response:**    Denied

132.    Turner was never hired by Signature LLC.

**Response:**    Drooker lacks sufficient knowledge or information to either admit or deny this request.

133.    Signature LLC considered hiring and/or pursued the possibility of hiring Peter Gentile ("Gentile").

**Response:**    Denied

134.    Signature LLC recruited Gentile to do F & A Business from Signature LLC's

Massachusetts office.

    **Response:**   Denied

    135.   Drooker knew of Signature LLC's interest in potentially hiring Gentile.

    **Response:**   Denied

    136.   Gentile was never hired by Signature LLC.

    **Response:**   Drooker is without knowledge or information sufficient to allow him to admit or deny this request.

    137.   Beacon Hill hired Gentile after Signature LLC's efforts to recruit him.

    **Response:**   Because Drooker was not aware of any efforts made by Signature LLC to recruit Gentile, Drooker cannot admit or deny this request.

    138.   Exhibit O (JC 375-380) attached hereto is a copy of a letter and employment

agreement, dated September 30, 2003, between Beacon Hill and Peter Gentile.

    **Response:**   Admit

    139.   Beacon Hill hired Peter Gentile to work in its financial division.

    **Response:**   Admit

    140.   Gentile has been directly involved in the F & A Business while employed by

Beacon Hill.

    **Response:**   Admit

    141.   Wang has worked in the F & A Business for many years.

    **Response:**   Admit

    142.   Beacon Hill hired Wang in or about August 2002.

**Response:**    Admit

143.    Beacon Hill hired Wang in 2002.

**Response:**    Admit

144.    Wang is currently employed by Beacon Hill.

**Response:**    Admit

145.    Wang works in the F & A Business for Beacon Hill.

**Response:**    Denied

146.    Wang is the CEO of Beacon Hill.

**Response:**    Admit

147.    Exhibit P (JC 563-564) attached hereto is copy of the agreement entered into

between Beacon Hill and Signature LLC in April 2001, pursuant to which Signature LLC

provided services to Beacon Hill.

**Response:**    Admit

148.    Exhibit Q (JC 565) attached hereto is a copy of the Summary Spread Analysis for

Connection Group for June 2002.

**Response:**    Objection.  The photocopy of the proposed Exhibit Q (JC 565) is cut off
and illegible on one side and thus does not represent a true and accurate copy of a business
record of Connection Group, and it is improper for plaintiffs to seek an admission as to the
authenticity of a document that is neither complete nor fully legible.

149.    Exhibit R (JC 566) attached hereto is a copy of the Summary Spread Analysis for

Connection Group for July 2002.

**Response:**    Objection.  The photocopy of the proposed Exhibit R (JC 566) is cut off

and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

150.    Exhibit S (JC 567) attached hereto is a copy of the Summary Spread Analysis for

Connection Group for August 2002.

**Response:** Objection.  The photocopy of the proposed Exhibit S (JC 567) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

151.    Exhibit T (JC 568-569) attached hereto is a copy of the Summary Spread Analysis

for Connection Group for September 2002.

**Response:** Objection.  The photocopy of the proposed Exhibit T (JC 569) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

152.    Exhibit U (JC 570-571) attached hereto is a copy of the Summary Spread Analysis

for Connection Group for October 2002.

**Response:**    Objection.  The photocopy of the proposed Exhibit U (JC 570-571) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

153.    Exhibit V (JC 572) attached hereto is a copy of the Summary Spread Analysis for

Connection Group for November 2002.

**Response:**    Objection.  The photocopy of the proposed Exhibit V (JC 572) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

154.    Exhibit W (JC 573) attached hereto is a copy of the Summary Spread Analysis for

Connection Group for December 2002.

**Response:**    Objection.  The photocopy of the proposed Exhibit W (JC 573) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

155.    Exhibit X (JC 592) attached hereto is a copy of the Summary Spread Analysis for Connection Group for January 2003.

**Response:**    Admit

156.    Exhibit Y (JC 593) attached hereto is a copy of the Summary Spread Analysis for Connection Group for February 2003.

**Response:**    Admit

157.    Exhibit Z (JC 594) attached hereto is a copy of the Summary Spread Analysis for Connection Group for March 2003.

**Response:**    Admit

158.    Exhibit AA (JC 595) attached hereto is a copy of the Summary Spread Analysis for Beacon Hill for April 2003.

**Response:**    Objection.  The photocopy of the proposed Exhibit AA (JC 595) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

159.    Exhibit BB (JC 596) attached hereto is a copy of the Summary Spread Analysis for Beacon Hill for May 2003.

**Response:**    Objection.  The photocopy of the proposed Exhibit BB (JC 596) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

160.    Exhibit CC (JC 597) attached hereto is a copy of the Summary Spread Analysis for Beacon Hill for June 2003.

**Response:**    Admit

161.    Exhibit DD (JC 598) attached hereto is a copy of the Summary Spread Analysis for Beacon Hill for July 2003.

**Response:**    Admit

162.    Exhibit EE (JC 599) attached hereto is a copy of the Summary Spread Analysis for Beacon Hill for August 2003.

**Response:**    Admit

163.    Exhibit FF (JC 600) attached hereto is a copy of the Summary Spread Analysis for Beacon Hill for September 2003.

**Response:**    Objection. The photocopy of the proposed Exhibit FF (JC 600) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

164.    Exhibit GG (JC 589) attached hereto is a copy of the Summary Spread Analysis for Beacon Hill's financial (A & F) division for October 2003.

**Response:**    Objection. The photocopy of the proposed Exhibit GG (JC 589) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

165.    Exhibit HH (JC 590) attached hereto is a copy of the Summary Spread Analysis for Beacon Hill's financial (A & F) division for November 2003.

**Response:**    Objection. The photocopy of the proposed Exhibit HH (JC 590) is cut off

and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

166.    Exhibit H (JC 591) attached hereto is a copy of the Summary Spread Analysis

for Beacon Hill's financial (A & F) division for December 2003.

**Response:** Objection. The photocopy of the proposed Exhibit H (JC 591) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

167.    Exhibit JJ (JC 608) attached hereto is a copy of the Summary Spread Analysis

for Beacon Hill's financial (A & F) division for January 2004.

**Response:**    Objection. The photocopy of the proposed Exhibit JJ (JC 608) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

168.    Exhibit KK (JC 606) attached hereto is a copy of a spreadsheet indicating

accounts receivables for Beacon Hill.

**Response:**    Admit

169.    Exhibit LL (JC 646-648) attached hereto is a copy of an Income Statement for

Beacon Hill's temporary financial division, dated December 31, 2003.

**Response:**    Admit

170.    Exhibit MM (JC 649-651) attached hereto is a copy of an Income Statement for

Beacon Hill's permanent financial division, dated December 31, 2003.

**Response:**    Admit

171.    Exhibit NN (JC 620-622) attached hereto is a copy of an Income Statement for

Beacon Hill's temporary financial division, dated February 29, 2004.

**Response:**    Objection.  The photocopy of the proposed Exhibit NN (JC 620-622) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

172.    Exhibit OO (JC 623-625) attached hereto is a copy of an Income Statement for

Beacon Hill's permanent financial division, dated February 29, 2004.

**Response:**    Objection.  The photocopy of the proposed Exhibit OO (JC 623-625) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

173.    Exhibit PP (JC 612-616) attached hereto is a copy of an Income Statement for

Beacon Hill, dated February 29, 2004.

**Response:**    Objection.  The photocopy of the proposed Exhibit PP (JC 612-616) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

174.    Exhibit QQ (JC 617-619) attached hereto is a copy of an Income Statement for

Beacon Hill, dated February 29, 2004.

**Response:**    Objection.  The photocopy of the proposed Exhibit QQ (JC 619) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

175.    Exhibit RR (JC 626-628) attached hereto is a copy of an Income Statement for

Beacon Hill's temporary legal division, dated February 29, 2004.

**Response:**    Objection.  The photocopy of the proposed Exhibit RR (JC 626-628) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

176.    Exhibit SS (JC 629-631) attached hereto is a copy of an Income Statement for

Beacon Hill's permanent legal division, dated February 29, 2004.

**Response:**    Objection. The photocopy of the proposed Exhibit SS (JC 629-631) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

177.    Exhibit TT (JC 632-634) attached hereto is a copy of an Income Statement for

Beacon Hill's temporary associates division, dated February 29, 2004.

**Response:**    Objection. The photocopy of the proposed Exhibit TT (JC 632-634) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

178.    Exhibit UU (JC 635-637) attached hereto is a copy of an Income Statement for

Beacon Hill's permanent associates division, dated February 29, 2004.

**Response:**    Objection. The photocopy of the proposed Exhibit UU (JC 635-637) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

179.    Exhibit VV (JC 638-639) attached hereto is a copy of a Balance Sheet for Beacon

Hill for each month in 2003.

**Response:**    Admit

180.    Exhibit WW (JC 640-642) attached hereto is a copy of an Income Statement for

Beacon Hill, dated December 31, 2003.

**Response:**    Admit

181.    Exhibit XX (JC 643-645) attached hereto is a copy of an Income Statement for

Beacon Hill, dated December 31, 2003.

**Response:**    Denied

182.    Exhibit YY (JC 668-671) attached hereto is a copy of an Income Statement for

Connection Group, dated December 31, 2002.

**Response:**    Objection.  The photocopy of the proposed Exhibit YY (JC 668-671) is
cut off and illegible on one side and thus does not represent a true and accurate copy of a
business record of Connection Group, and it is improper for plaintiffs to seek an admission as to
the authenticity of a document that is neither complete nor fully legible.

183.    Exhibit ZZ (JC 672-674) attached hereto is a copy of an Income Statement for

Connection Group, dated December 31, 2002.

**Response:**    Objection.  The photocopy of the proposed Exhibit ZZ (JC 672-674) is cut
off and illegible on one side and thus does not represent a true and accurate copy of a business
record of Connection Group, and it is improper for plaintiffs to seek an admission as to the
authenticity of a document that is neither complete nor fully legible.

184.    Exhibit AAA (JC 675-677) attached hereto is a copy of an Income Statement for

Connection Group's temporary division, dated December 31, 2002.

**Response:**    Objection.  The photocopy of the proposed Exhibit AAA (JC 675-677) is
cut off and illegible on one side and thus does not represent a true and accurate copy of a
business record of Connection Group, and it is improper for plaintiffs to seek an admission as to
the authenticity of a document that is neither complete nor fully legible.

185.    Exhibit BBB (JC 678-681) attached hereto is a copy of an Income Statement for

Connection Group's permanent division, dated December 31, 2002.

**Response:**    Objection.  The photocopy of the proposed Exhibit BBB (JC 678-681) is
cut off and illegible on one side and thus does not represent a true and accurate copy of a
business record of Connection Group, and it is improper for plaintiffs to seek an admission as to
the authenticity of a document that is neither complete nor fully legible.

186.    Exhibit CCC (JC 682-683) attached hereto is a copy of a Schedule of Allocated

G & A Expenses for Connection Group, dated December 31, 2002.

**Response:**    Objection.  The photocopy of the proposed Exhibit CCC (JC 682-683) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

187.    Exhibit DDD (JC 684-685) attached hereto is a copy of an Income Statement for

Connection Group for the year-ended 2001.

**Response:**    Objection.  The photocopy of the proposed Exhibit DDD (JC 684-685) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

188.    Exhibit EEE (JC 686-687) attached hereto is a copy of an Income Statement for

Connection Group for the year-ended 2001.

**Response:**    Objection.  The photocopy of the proposed Exhibit EEE (JC 686-687) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

189.    Exhibit FFF (JC 688-689) attached hereto is a copy of an Income Statement for

Connection Group for the year-ended 2001.

**Response:**    Objection.  The photocopy of the proposed Exhibit FFF (JC 688-689) is cut off and illegible on one side and thus does not represent a true and accurate copy of a business record of Connection Group, and it is improper for plaintiffs to seek an admission as to the authenticity of a document that is neither complete nor fully legible.

190.    Exhibit GGG (JC 690-691) attached hereto is a copy of a Balance Sheet for

Connection Group for each month in 2001.

**Response:**    Admit

191.    Exhibit HHH (JC 692-693) attached hereto is a copy of a Balance Sheet for

Connection Group for each month in 2001.

**Response:**    Objection. The request implies that the attached exhibit is a balance sheet for the entire company as of that date.

192.    Exhibit III (JC 694-695) attached hereto is a copy of a Balance Sheet for

Connection Group for each month in 2001.

**Response:**    Objection. The request implies that the attached exhibit is a balance sheet for the entire company as of that date.

## VERIFICATION

The undersigned Steven Drooker hereby attests under oath that the above answers are true to the best of his knowledge information and belief.

_____
Steven Drooker

October 11, 2004

AS TO OBJECTIONS

James W. Stoll, Esq.
Erika Holmes, Esq.
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111
Tel - (617) 856-8200
Fax - (617) 856-8201


TODD S. PAYNE, ESQ.
FLA. BAR # 834520
ZEBERSKY & PAYNE, LLP
4000 Hollywood Blvd., Ste. 400 North
Telephone: (954) 898-6333
Facsimile: (954) 989-7781

## CERTIFICATE OF SERVICE

        This will certify that a true and correct copy of this document was served on counsel of record on the _____ day of October, 2004, by electronic mail, and overnight mail as follows:

LARRY STUMPF
Black, Srebnick, Kornspan & Stumpf, P.A.
201 S. Biscayne Boulevard, Suite 1300
Miami, Florida 33131

James W. Stoll